### HIGGINS v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. February 7, 1911.)

No. 2,064.

1. CRIMINAL LAW (§ 731*)—TRIAL—DEMURRER TO EVIDENCE.

Where the determination of the guilt or innocence of a defendant charged with crime depended almost entirely on the credibility of the witnesses and the weight to be given to their testimony, and not on any inferences to be drawn from admitted or established facts, it was not error for the court to refuse to direct a verdict of acquittal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1694, 1695; Dec. Dig. § 731.*]

2. CRIMINAL LAW (§ 1037*) — REVIEW ON APPEAL OR ERROR — CONDUCT OF COUNSEL.

To entitle an accused to a reversal because of improper language used by the prosecuting attorney in argument to the jury, it must appear that the attention of the court was called to the improper remarks at the time with a request for its interposition, and that an exception was taken to its refusal, and also that the language objected to was so improper as to be clearly injurious to defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1691, 2645; Dec. Dig. § 1037.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. CRIMINAL LAW (§ 857*)—DELIBERATIONS OF JURY—ALTERATION OF EXHIBITS.**

The fact that a diagram taken by the jury to their room in a criminal case by consent of both parties was afterward found to contain pencil marks which were not there when it was introduced in evidence, it not appearing when or by whom they were made, is not ground for reversing the judgment.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2054–2055; Dec. Dig. § 857.*]

**4. CRIMINAL LAW (§§ 911, 1156*)—REVIEW ON APPEAL OR ERROR—DISCRETION OF LOWER COURT—GRANTING OR REFUSING NEW TRIAL.**

In the federal courts the granting or refusal of a new trial in a criminal case rests in the discretion of the court; and its action in the exercise of such discretion will not be reviewed by an appellate court, although a refusal to exercise it, or an abuse of discretion, is ground for reversal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2134, 3067–3071; Dec. Dig. §§ 911, 1156.*]

In Error to the District Court of the United States for the Western District of Michigan.

Frank L. Higgins was convicted of a criminal offense, and brings error. Affirmed.

John W. Shine, for plaintiff in error.

George G. Covell, U. S. Atty., Wm. K. Clute, Asst. U. S. Atty., and Fred C. Wetmore, for the United States.

Before SEVERENS, Circuit Judge, and COCHRAN and SATER, District Judges.

COCHRAN, District Judge. The plaintiff in error complains of a judgment of the lower court sentencing him to be confined in the penitentiary for 14 months and to pay a fine of $1,118.08. He had been assistant postmaster at Sault Ste. Marie, Mich. The indictment under which the conviction was had consisted of three counts. The first one was under section 4053, U. S. Rev. Statutes (U. S. Comp. St. 1901, p. 2755), and charged him with willfully neglecting to deposit, as required by that section, $1,257.20 postal revenues of the United States in his temporary custody. The second count was under section 5492 and charged him with unlawfully failing to deposit as required by that section $1,118.08, money order funds in his hands and possession. And the third count was under section 4046 (page 2752), and charged him with unlawfully and feloniously converting to his own use and embezzling $1,118.08 of the money order funds and property of the United States.

The plea was not guilty and trial was had before a jury. At the conclusion of the evidence, the defendant moved the court to dismiss the case as to each count because there was no evidence tending to support it and to quash the first and second counts because of insufficiency. The court struck out the first count because there was no evidence tending to sustain it, and, except to this extent, overruled the motion. It submitted the case to the jury on the second and third counts which found the defendant guilty on both. The court in its charge told the jury that the defendant could not be found guilty under the second

count unless the failure to deposit charged therein had been willful and intentional with the wicked intent to keep the money not deposited on hand so that it might be subject to embezzlement or appropriation by him—it was a step in the direction of and to the end and in aid of a contemplated misappropriation and embezzlement of it—and he was also found guilty under the third count.

The first error assigned is the overruling of the motion to quash the second count. Though that count was in the language of the statute, possibly just criticism can be made of it, in that it did not charge that the failure to deposit was willful and intentional, if the position taken in the charge, which finds support in the case of Dimmick v. United States, 121 Fed. 638, 57 C. C. A. 664, that such a mental state is an essential element of the offense created by section 5492 (page 3705) is sound, and in that it was not specific enough as to what the requirement was as to making deposit which had not been complied with. But the necessities of this case do not call for any expression of opinion on these matters, and we therefore pass them by. The defendant's guilt under the second count was made to turn on his guilt under the third. He was found guilty under the third, and the punishment imposed was within that affixed by section 4046.

The second error assigned is the overruling of the motion to direct a verdict of no cause of action under the testimony as to the third count. The motion was hardly as broad as this. It was to dismiss the action because there was no evidence tending to sustain that count. We will, however, treat the motion as if it were to direct a verdict because the evidence was not sufficient to establish defendant's guilt beyond a reasonable doubt. It is suggested on behalf of defendant in error that there was no exception taken to the action of the court overruling this motion. We do not so read the record. There was no exception taken to any portion of the charge to the jury, but one was taken to that action of the court, and this exception was sufficient to save the error, if one was committed.

That defendant on Saturday, December 12, 1908, failed to make deposit of money order funds in his possession in strict compliance with the requirement as to deposit thereof, was clearly shown by the evidence. The requirement was that all over $500 should be deposited daily. The depository was the first National Bank of Sault Ste. Marie, whose place of business was on the corner diagonally opposite that occupied by the post office, and on Saturdays, though it closed at noon, it reopened at 6 p. m., and remained open until 8 p. m., which was after money order hours. That Saturday night after close of those hours defendant had in his possession in the post office safe, according to the books, $1,338.42 of money order funds and he made no deposit on that day. The defendant, however, testified—and in this he was not contradicted—that the custom was to deposit for Saturday on Monday morning and not to deposit on Saturday, and that this custom was well known to the Post Office Department. In view of this, it was hardly open to claim that the failure to deposit on the Saturday in question was a step in the direction and in aid of a contemplated embezzlement. The most that could be claimed was that advantage was taken of this custom to accomplish the embezzlement.

The defendant admitted that on that Saturday night and on the following Sunday night, December 13, 1908, he so had in his possession that amount of money order funds, and that $1,118.08 thereof, the amount he was charged with embezzling, on the latter night, disappeared from the post office, and that this disappearance took place whilst he and no other official or employé was there. His claim was that about 8 p. m. he was attacked in the office, whither he had gone to make up the pay roll for the ensuing 15th, amounting to $852.83, and to distribute in pay envelopes from the postal funds the amount coming to each employé, and was beaten into unconsciousness, from which he did not recover until 4 or 5 a. m. the next morning, by two men, who had gained entrance from the street by the back door after he had responded to raps and ascertained that they wanted mail and gone to see if there was any for them, leaving the door unlocked, and that these men took and carried away from the post office that amount of the money order funds and $1,257.20 of postal funds. His guilt or innocence therefore of the offense charged depended on the truthfulness of this claim. If he had been robbed, he had not embezzled; but, if he had not been robbed, it followed inevitably that he had embezzled. Robbery or no robbery was the crucial question in the case, and the assignment of error under consideration brings before us the question whether the evidence was such that it was possible for a fair-minded man to have an unhesitating conviction that there had been in fact no robbery, and that the claim that there had been was set up to cover an embezzlement of the funds which had disappeared.

The direct evidence supporting this claim was the testimony of the defendant himself detailing the circumstances of the alleged robbery; the testimony as to wounds on his head and back, as to the extent of which there was some difference amongst the witnesses, and as to his being in a more or less unconscious state from the time the occurrence was discovered which was about 10:35 p. m. until 4 or 5 o'clock the next morning; the testimony of a woman that about 8 p. m. she saw one of two men, answering somewhat to his description of the men whom he claimed had attacked him, on the street in front of the post office looking through a large plate glass window at defendant sitting at his desk engaged in making up the pay roll with the money displayed thereon; and the testimony of another woman that along about the same hour as she was passing the post office on the opposite side of the street she saw two men, also answering somewhat to that description, running across the street from the post office, and heard one of them say, "Did we not do that slick? That was the easiest job of the kind I have ever done."

The evidence against the truthfulness of the claim was mainly that of the physician, who was called to treat him shortly after the occurrence was discovered, which, as stated, was about 10:35 p. m. and who continued to treat him after he was removed to the hospital, to the effect that at no time after this discovery was he unconscious—that until he apparently came to at 4 or 5 o'clock in the morning he was shamming unconsciousness, that at the post office and again at the hospital he saw defendant glance at him under the corner of his eye, or, as he otherwise expressed it, peeking out of the corner of his eye, and that

the wounds on his head were not sufficient to produce unconsciousness. The policeman who first discovered the occurrence had testified that his attention was directed to it by seeing the defendant come out of the back door of the post office and walk down several steps, and then a distance of 25 feet and fall; that he lifted him up first in a sitting position and then on his feet, and with his assistance defendant walked back up the steps into the post office; and that as he was being assisted into a chair he muttered, "They hit me." It had been further testified that he walked with assistance in going to and from the ambulance, in which he was taken to the hospital. The physician referred to and two others testified that an unconscious person could not have walked and spoken as he then did, and that, if he was then conscious and afterwards relapsed into unconsciousness at the hospital, he would not have regained consciousness, but would have died. The testimony of the first woman referred to above was met by the testimony of three witnesses that it was impossible for one looking through the plate glass window at the front to have seen anything on the desk where defendant claimed to have been at work by reason of the safe doors, which according to her testimony and that of those who entered the post office after the discovery were open; the safe being between the window and the desk. This, in substance, was the evidence presented by the United States. In rebuttal two physicians testified that a person, at least in a semiunconscious condition, might have acted as defendant did after the discovery and before he was at the hospital, and that, lapsing into unconsciousness there need not necessarily have been fatal, and one or two witnesses testified to statements made by the physician whose testimony bore so heavily against defendant to the effect that he was in a serious condition when he was called in to treat him, the making of which statements he had denied when asked about them.

Such, then, was substantially the case which the jury had before it from which to determine the truthfulness of defendant's claim. It certainly cannot be urged that there was no evidence tending to show that it was false and that defendant was guilty—the form in which his motion for a directed verdict was cast. And it must be conceded that the truthfulness thereof and defendant's guilt or innocence depended almost entirely on the credibility of the witnesses and the weight to be attached to their testimony. If, indeed, defendant shammed unconsciousness, there is no escape from the conclusion that his claim was false, and that he was guilty; and, if he glanced or peeked at the physician from the corner of his eye, there is not much room to doubt as to his shamming unconsciousness. That he so did was positively testified to by the physician, whom the jury saw and heard. It saw and heard the defendant detail the circumstances of the alleged robbery. The reasonableness thereof and whether their telling rang true or false, if that was determinable, it was in position to judge. And so it was with each of the witnesses. This was a case whose decision depended peculiarly on the credibility of the witnesses and the weight of their testimony. It did not call much, if at all, for a determination of the inferences that should be drawn from admitted or established facts. The jury was in much better position than we to pass on the credibility of the witnesses and the weight of their testimony, if indeed, it was not

better qualified to exercise that function, even though we were in like position. The question of robbery or no robbery was put to it as the vital question in the case without intimation of opinion from the trial judge, and he on motion for new trial, having also seen and heard the witnesses, refused to disturb its finding. In this condition of things it is not for us to express any opinion as to the guilt or innocence of the defendant. It is sufficient to say that we are wanting in any conviction that an injustice has been done him, and, for lack of all the data the jury had before it if for no other reason, would not be justified in holding that a fair-minded person in the position of the jury could not have believed beyond a reasonable doubt that the defendant was guilty of the offense charged.

The other assignments relate to alleged misconduct of the district attorney in his argument to the jury, the allowing the jury to take a certain diagram of the post office, offered in evidence, to its room when the case was submitted to it, and the overruling of the motion for a new trial. It is urged that the district attorney was at fault in two particulars.

Pending the trial the proceedings were suspended, and in the presence of the jury a former cashier of a national bank was called upon to plead to an indictment charging him with embezzlement and misapplication of the funds of his bank. He stood mute as to some counts, and pleaded not guilty as to others. It is stated in brief for plaintiff in error.that evidence was introduced to the effect that he was a man of high standing in the community where he lived. There is no such evidence in the record before us, but it is quite likely that some such evidence was introduced and his counsel in his argument to the jury laid stress on it. In response to this the district attorney said to the jury:

"Counsel for respondent would have you believe that because of Mr. Higgins' high standing it is not probable that he committed this offense, and they endeavor to make a strong point of the fact of his high standing as showing that he did not commit the offense with which he is charged; but I want to tell you that these are the kind of offenses that men of high standing commit. You have seen men of high standing come into court and plead to charges of a similar character and equally grave."

The other particular of which complaint was made was this. On the trial defendant introduced two policemen named Coulter and Roberts. The latter was the one who first discovered the occurrence. The other was called to the post office shortly afterwards. Each testified as to what they saw of defendant at the post office. They had been summoned by the prosecution. Afterwards Coulter was introduced by the prosecution to testify as to the possibility of one looking through the plate glass window at the front seeing the top of the desk at which defendant claimed to have been sitting and the money on top. Possibly Roberts testified to the same effect. But the record does not show it. This is another instance possibly of the record not being complete. In the course of his argument to the jury the district attorney had this further to say:

"The respondent's own witnesses Coulter and Roberts testified that with the safe door standing open at right angles with the front of the safe the desk

could not be seen, and they are bound by the testimony of their own witnesses."

In the case of Crumpton v. United States, 138 U. S. 361, 11 Sup. Ct. 355, 34 L. Ed. 958, Justice Brown said:

"No objection was made at the time of this argument nor was the court requested to interrupt it or caution the jury against its form, and no exception appears to have been taken. There is no doubt that in the excitement of an argument counsel do sometimes make statements which are not fully justified by the evidence. This is not such an error, however, as will necessarily vitiate the verdict or require a new trial. It is the duty of defendant's counsel at once to call the attention of the court to the objectionable remarks and request its interposition and in case of refusal to note an exception."

In the first particular complained of, it does not appear that the court was requested to interpose and rule the remark out as improper, or that any exception was taken to any ruling of the court. The bill of exceptions simply recites as follows:

"To which remark of the district attorney defendant's counsel then and there excepted."

In the other particular such a request may be said to have been made. Defendant's counsel addressing himself to the court said:

"If the court please, I except to counsel's argument in that particular. These were the government witnesses subpœnaed here by the government and were simply called in the courtroom here by the defense to prove certain things, and it is an unfair argument to make to the jury that because we called them for certain things that we are bound by all they say."

In answer to which the court said:

"Well, we will let Mr. Covell complete his argument."

If this be treated as a request to rule the remark out and a refusal so to do, no exception was taken to the ruling of the court.

These considerations are sufficient to dispose of these assignments, but it is not essential to dismiss them with this and nothing more.

In the case of Chadwick v. United States, 141 Fed. 225–245, 72 C. C. A. 343, 363, Judge Lurton said:

"But, to entitle the accused to a reversal when objection is made and the language not withdrawn, it must appear that the matter objected to was plainly unwarranted and so improper as to be clearly injurious to the accused."

In answer to reliance by defendant's counsel on the fact that up to the occurrence in question defendant had been a man of high standing in the community it was legitimate argumentation for the district attorney to allude to the fact, known of all, that men of previous good standing do commit crimes and the reference to the case of the bank cashier who had been called to plead to the indictment against him in the jury's presence was hardly more than an illustration of this fact. In the other instance it cannot be said to have been improper for the district attorney to call attention to the fact that witnesses placed on the stand by defendant had, when recalled by the prosecution, testified to matters adverse to him, and this suggestion was met by the counter remark of defendant's counsel that the witnesses had been subpœnaed by the United States. It was putting it too strong to say that defendant

was bound by their testimony. But, if to any extent the District Attorney went beyond what was proper in either of these instances, it cannot be said that the action was so improper as to be clearly injurious to the defendant.

Concerning the diagram, the bill of exceptions states that it was prepared by the prosecution, was in ink, and was sent to the jury room with the consent of both parties. The court made no ruling on the subject, and the sole ground of complaint was that after the trial it was discovered that the diagram had pencil marks on it indicating that the desk was so situated that a view of it would be obstructed from the front window by the safe; it not appearing when, where, or by whom the pencil marks were made. This matter was called to the attention of the trial judge on the motion for a new trial. Of course, there is nothing in it calling for a reversal.

The final error assigned is the overruling of defendant's motion for a new trial. It is well settled that the granting or refusing a new trial is a matter within the sound discretion of the trial court, and that its action in the exercise of such discretion cannot be reviewed. It is also settled that, if the trial court refuses to exercise or abuses this discretion, its judgment will be reversed because thereof. Felton v. Spiro, 78 Fed. 576, 581, 24 C. C. A. 321; James v. Evans, 149 Fed. 136, 141, 80 C. C. A. 240; Mattox v. United States, 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917; Dwyer v. United States, 170 Fed. 160, 95 C. C. A. 416.

An attempt is made to bring this case within the latter rule. But the lower court in acting on the motion for new trial did not refuse to exercise or abuse its discretion. It overruled the motion because in the exercise of its discretion it did not believe that defendant was entitled to a new trial.

Finding no error, the judgment is affirmed.