SPARKS et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1917.)

No. 2817.

1. POST OFFICE ⟨⟩35—FRAUDULENT USE OF MAILS—SCHEMES TO DEFRAUD.

Where defendants were charged with using the mails in furtherance of a scheme to defraud depositors and creditors of a bank by false representations as to its financial condition, the bank's actual solvency, in the sense of having assets of value in excess of its liabilities and the ultimate collectibility of loans to the bank, was not conclusive against an intent to defraud, as creditors were defrauded, within the meaning of the law, if induced to part with their money by materially false representations of the bank's financial condition and its ability to pay its indebtedness as it matured in regular course, and thereby subjected to substantial risk of failure to recover their money in full.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55.]

2. Post Office ⬤⇒35—Fraudulent Use of Mails—Schemes to Defraud.

Under Penal Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1916, § 10385), prohibiting the use of the mails in furtherance of schemes to defraud, the schemes condemned are not confined to devices by which it is intended that the customer shall receive nothing for his money, but includes schemes to defraud by means of false pretenses, though used in the prosecution of an established business, legitimate if honestly conducted.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55.]

3. Post Office ⬤⇒49—Fraudulent Use of Mails—Evidence.

On a trial for using the mails in furtherance of a scheme to defraud depositors and creditors of a bank by means of false reports concerning its financial condition, evidence as to the financial condition of the bank and the falsity of such reports held sufficient to support a conviction of such of the defendants as knew of the bank's condition and were connected with such reports.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86.]

4. Post Office ⬤⇒50—Fraudulent Use of Mails—Questions for Jury.

On such trial, evidence held to make a question for the jury as to the guilt of a director and cashier, who was the bank's active manager, continuously in the bank, and passing on everything in a banking way, and who personally signed and swore to each of the reports, mailed them to the comptroller, and was not claimed to be unfamiliar with their contents.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89.]

5. Post Office ⬤⇒49—Fraudulent Use of Mails—Questions for Jury.

On such trial, evidence held insufficient to make a question for the jury as to the guilt of a former director in the bank, who claimed not to have been a director during any part of the period covered by the alleged fraudulent scheme, though he was indebted to the bank, had overdrafts with it, and adjusted them, once only temporarily, at the time the reports were to be made.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86.]

6. Post Office ⬤⇒50—Fraudulent Use of Mails—Questions for Jury.

On such trial, evidence held insufficient to make a question for the jury as to the guilt of the teller in the bank, who was neither a director nor stockholder, and had nothing to do with its financial management, and never owed the bank anything, though on one occasion, at the time a report was to be made, an item was reduced by crediting it to him, instead of to the proper account.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89.]

7. Criminal Law ⬤⇒723(1)—Trial—Improper Argument of Counsel.

On a trial for using the mails in furtherance of a scheme to defraud depositors and creditors in a bank by false reports of its financial condition, counsel for the government in his argument said that men connected with bank cases lived in honorable circles, had large acquaintances, and that, by reason of the confidence people had in them, their power for good or evil was increased, that in connection with the savings bank, people with their little savings would walk up with their tin buckets and lay their earnings on the counter, that entries would be made in a book, and that after another day, week, or month they would carry in more earnings, and further remarked, in connection with an objection by defendant's counsel, that such counsel seemed to be out of sympathy with the tin bucket, understood by defendants' counsel as meaning that they were out of sympathy with labor. Held, that while the argument and retort, standing alone, might not require reversal, they were suffi-

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ciently near the border line to warrant consideration in connection with another alleged error complained of.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1663, 1674, 1676.]

8. CRIMINAL LAW &⇒1171(1)—APPEAL—HARMLESS ERROR—ARGUMENT.
Though the court did not rule upon an objection to argument, or hold the language improper, reversible error was not committed, unless the matter objected to was plainly unwarranted, and so improper as to be clearly injurious to accused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3127.]

9. POST OFFICE &⇒49—FRAUDULENT USE OF MAILS—EVIDENCE.
On a trial for using the mails in furtherance of a scheme to defraud the depositors and creditors of the C. Bank by false reports of its financial condition, it was shown that, when reports were to be made, the amount of loans and discounts would be reduced and the amount due from other banks increased, by rediscounting notes with a correspondent bank, which notes would be restored to loans and discounts the next day. Defendants offered to show by S., the cashier and active manager of the C. Bank, that the president of the correspondent bank told him not to refuse to buy paper or make loans because his bank was a small bank, as the correspondent bank, whenever occasion arose, would take over any paper which the C. Bank did not want for a time, or permanently, that he relied on his correspondent taking over loans and discounts at statement times, and took them back to get for the C. Bank the earnings on the increased loans. *Held*, that this evidence should have been admitted as having a tendency to repel to some extent the inference of fraudulent intent, as it tended to show that a larger amount of loans was taken than otherwise would have been, in reliance on the fact that the correspondent bank would take such excessive loans, not only over statement day, but for such length of time as the C. Bank might desire.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86.]

10. CRIMINAL LAW &⇒419, 420(11)—EVIDENCE—HEARSAY.
Proof of the actual conversation with the president of the correspondent bank, so far as it bore directly upon the claimed arrangement, was not hearsay, but was the best evidence of such arrangement.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 980–983.]

11. CRIMINAL LAW &⇒675—RECEPTION OF EVIDENCE—FRAUDULENT USE OF MAILS.
The testimony of S. that the president of the correspondent bank said they "would help us in case my loans became too heavy," and agreed to rediscount paper for him if it became necessary, was a mere conclusion of the witness, and its admission did not justify exclusion of the actual conversation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 850, 1607.]

12. POST OFFICE &⇒49—FRAUDULENT USE OF MAILS—EVIDENCE.
S. could properly testify directly to the absence of fraudulent intent and motives on his part.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86.]

13. CRIMINAL LAW &⇒1170(1)—HARMLESS ERROR—PARTIES PREJUDICED.
The exclusion of evidence of such conversation was prejudicial, not only to S., but to his codefendants, as, in view of his relations to the bank and to the arrangement in question, they could not have participated in a fraud of which he was not guilty.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3145, 3149–3152.]

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. POST OFFICE ☜49—FRAUDULENT USE OF MAILS—EVIDENCE.

On a trial for using the mails in furtherance of a scheme to defraud depositors and creditors of the bank by false reports, evidence of the actual value of the bank's assets at the time of its failure and during the period covered by the alleged fraudulent scheme is admissible.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86.]

15. POST OFFICE ☜35—FRAUDULENT USE OF MAILS—KNOWLEDGE.

The president of a bank, charged with being a party to a scheme to defraud its depositors and creditors, in connection with which the mails were used, was not, by virtue merely of his office, charged with knowledge of the contents of the bank's books; nor was he charged with knowledge of the contents of a report, merely because it was sworn to before him as notary public.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55.]

16. POST OFFICE ☜50—FRAUDULENT USE OF MAILS—INSTRUCTIONS.

On a trial for fraudulent use of the mails in connection with reports as to a bank's financial condition, the jury should have been instructed as to the meaning of insolvency, as involved in the closing of the bank's doors under the state law, and that the mere fact of such closing and a receivership did not necessarily mean that its liabilities exceeded its assets, having in mind, however, that this latter kind of insolvency was not necessary to the alleged fraudulent scheme.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89.]

17. CRIMINAL LAW ☜1172(8)—HARMLESS ERROR—INSTRUCTIONS.

An instruction that, if defendants were guilty under the first count, they should be found guilty under all counts, was harmless, if inaccurate, where the sentence given was imposable under any one of the counts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3161.]

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Samuel L. Sparks and others were convicted of offenses, and they bring error. Reversed and remanded, with directions.

Caruthers Ewing and W. W. Farabough, both of Memphis, Tenn., for plaintiffs in error.

Hubert F. Fisher, U. S. Atty., of Memphis, Tenn., and S. R. Rush, Sp. Asst. Atty. Gen. U. S., of Omaha, Neb.

Before KNAPPEN and DENISON, Circuit Judges, and HOLLISTER, District Judge.

KNAPPEN, Circuit Judge. The Chickasaw Banking & Trust Company was a banking corporation organized in 1905 under the laws of Tennessee and doing business at Memphis. On the 7th day of January, 1913, it closed its doors by reason of insolvency. Following the bank's failure, plaintiffs in error and one Biles were indicted upon eight counts, seven of which charged the use of the mails to promote a scheme to defraud in violation of section 215 of the Penal Code of the United States. The remaining count charged a conspiracy, within section 37 of the Code (Comp. St. 1916, § 10201), to violate section 215 thereof. Plaintiff in error Sparks was the bank's cashier, Neuhardt was its president and a member of the board of directors, Nelson was its teller, Goldbaum a director, Browne a stockholder and (for a time, at least) a director, and Biles a prominent stockholder.

The alleged scheme to defraud is charged to have been formed December 30, 1911, at which time the bank is alleged to have been insolvent. In substance sufficient for present purposes, the fraudulent scheme charged was, by means of false and fraudulent representations, to induce certain persons named and the public generally to loan money to the bank, through deposit therein or more formal loan, which money so to be loaned it was alleged the bank would be finally unable to pay, and in fact unable to do a solvent and legitimate banking business under the laws of Tennessee; the bank to be under the control of the defendants, who, it was alleged, were to fraudulently manage its affairs, to the injury and loss of the bank's creditors and stockholders, and in the interest of the bank, as well as of defendants and corporations in which they were interested, through their conversion of such moneys so loaned the bank by means of unsecured drafts and worthless notes and securities, as well as the issue of certificates of deposit and cashier's checks, without consideration to the bank therefor. The false representations particularly charged were to be contained in reports of the bank's financial condition, including its capital, surplus, and liabilities, which would become part of the public records of the comptroller of the treasury of Tennessee, be published in newspapers of general circulation, and be sent to the persons to be defrauded and to the general public.

The first count charged the mailing to the state comptroller of the treasury of an alleged false and fraudulent statement or report of the bank's financial condition at the close of business on December 30, 1911. The second count charged the mailing of this statement to a New York bank; the third count, the transmission of that statement through the mails by printing it in a Memphis newspaper of general circulation; the fourth count, a like publication of an alleged false statement of the bank's condition on December 31, 1912; the fifth count, the transmission by mail to a New York bank of an alleged false financial statement of the bank's condition on June 29, 1912; the sixth count, the receiving by Sparks, cashier, through the mails of a certain letter; the seventh count, the transmission through the mails of the bank's financial statement of December 31, 1912. The eighth count charged the conspiracy before stated.

Biles pleaded nolo contendere, and is said to have submitted to judgment. Plaintiffs in error, at the conclusion of the trial under their pleas of not guilty, moved for directed verdict in their favor, for lack of evidence to warrant conviction. The motion was overruled and verdict of guilty rendered as to each plaintiff in error—sentence being imposed thereunder. Defendants then moved in arrest of judgment, on the ground of lack of evidence to sustain conviction. This motion was likewise overruled.

[1] 1. The question demanding first consideration thus is whether there was sufficient evidence to warrant conviction. While there was no express testimony that the bank was actually insolvent during the period referred to, in the sense that its debts exceeded the fair value of its assets, we are unable to say that the evidence was insufficient to warrant a finding, under the strict rules applicable to criminal trials, that on December 30, 1911, and continuously thereafter, until actual fail-

ure came, the bank was immediately threatened with the necessity to suspend through inability to meet its liabilities, as they matured in the ordinary course of business, for such insolvency means bank failure, with its attendant delays and risks of losses by creditors in greater or less degree.[1] Even the bank's actual solvency, in the sense of having assets of value in excess of its liabilities, and thus the ultimate collectibility of loans made to the bank, is not conclusive against an intent to defraud; for such creditors are defrauded, within the meaning of the law, if induced to part with their money by materially false representations of the bank's financial condition and its ability to pay its indebtedness as it matures in regular course, and thereby subjected to substantial risk of failure to recover their money in full. Bettman v. United States (C. C. A. 6) 224 Fed. 819, 827, 140 C. C. A. 265.

[2]. The scheme to defraud condemned by section 215 of the Penal Code is not confined to devices by which it is intended that the customer shall receive nothing for his money. Harris v. Rosenberger (C. C. A. 8) 145 Fed. 449, 455, 76 C. C. A. 225, 13 L. R. A. (N. S.) 762; Wilson v. United States (C. C. A. 2) 190 Fed. 427, 432, 433, 111 C. C. A. 231, and following. A scheme to defraud by means of false pretenses is within the section invoked (United States v. Steever, 222 U. S. 167, 174, 32 Sup. Ct. 51, 56 L. Ed. 145), even though used in the prosecution of an established business, legitimate if honestly conducted (Foster v. United States [C. C. A. 6] 178 Fed. 165, 172, 101 C. C. A. 485; Harris v. Rosenberger, supra; Bettman v. United States, supra, 224 Fed. at pages 825, 826, 140 C. C. A. 265).

[3] As affecting the question of imminently threatened suspension for insolvency: The bank's capital was only $25,000. Before December, 1911, the bank was heavily loaded up with paper not collectible in the regular course of business. The Rex Handle Company item is the most prominent one of this nature. The bank had loaned that company's predecessor between $10,000 and $15,000. To prevent receivership of that debtor, the bank in 1907 organized the Rex Handle Company, some of the bank's officers. and stockholders helping in the incorporation, but, for the most part, without personal interest therein. The bank furnished the new company enough more money to make $20,000, taking therefor $10,000 of its bonds out of an issue of $25,000, and $10,000 preferred stock out of an issue of $20,000. Further loans were made to the Handle Company in 1909 and 1910. After 1910, at least, the company paid neither interest nor dividends, and the bank was, for its protection, obliged to pay interest on bonds sold others, as well as the expense of maintaining a watchman and paying interest and taxes. In this way its investment had continually increased, until at the time of the failure it amounted to about $46,000, or nearly double the bank's capital. A note of more than $14,000 had been unpaid since November, 1909, and was unpaid when the bank failed. This account had caused so much trouble that Neuhardt, Sparks, and Biles had given their notes to the bank, aggregating about

---

[1] This is the sense in which the word "insolvency" is used in the Tennessee statute forbidding insolvent banks to receive deposits. Shannon's Code, § 6840; Minton v. Stahlman, 96 Tenn. (12 Pick.) 98, 107–111, 34 S. W. 222.

$22,000, to help to take up the indebtedness. For a portion, at least, of this $22,000, the Handle Company had issued notes to one or more of the parties named.

While there was testimony that the Handle Company's property was worth enough to enable ultimate payment of the bank's claim, and that negotiations for such sale had been on foot, it does not appear that during the nearly two years elapsing between the bank's failure and the trial of this case below anything had been realized from this item, and its collectibility seems to be at least seriously doubtful.

At the time of and before the bank's failure nearly all the defendants were interested in various corporations, many of which had paid no dividends, and to some of which loans had been made by the bank either upon their own paper alone or by indorsement of one or more of the defendants; some of the inactive stocks mentioned being pledged to secure the indebtedness of one or more of the defendants. The indebtedness to the bank from the various defendants, and from the corporations in which they were personally interested, and on which one or more of them were liable, exceeded the bank's capital. On December 30, 1911, Neuhardt and Sparks were together on paper (presumably growing out of the Handle Company claim) for $5,600 and upwards. This, including interest, amounted when the bank closed to more than $6,000. This debt seems to have been paid since the failure. When the bank failed Neuhardt was also indorser upon the paper of two corporations (in one of which he was personally interested) for about $7,000. On one of these items a partial payment has been made since the failure. On the same 30th day of December Sparks owed the bank more than $2,300, consisting of a series of notes, some of which dated back to 1907; no interest was ever paid upon them. When the bank closed he owed it more than $6,000. On December 30, 1911, Browne owed the bank more than $9,000, some of which had been standing two or three years. When the bank closed he owed it more than $6,600, for which he had pledged stock in two companies which had never paid a dividend, and in both of which companies Neuhardt was or had been interested. Whether or not Browne's remaining indebtedness has since been paid does not appear. Goldbaum owed the bank more than $7,000 December 30, 1911, some of which had been standing since 1907. When the bank closed he still owed it more than $7,000. Whether the debt has since been paid does not appear. Biles was interested in several companies which did business with the bank, and was on considerable paper in one way or another. He had deposited with the bank $18,000 of collateral, said to have been adequate to take care of the indebtedness. That of R. L. Biles & Co., and perhaps of the other Biles firms, has been taken up since the bank failed.

Most of the defendants carried overdrafts. The daily average of Browne's overdraft was more than $1,300, that of Goldbaum about the same, that of Neuhardt about $3,800, that of Sparks more than $1,200, that of Biles & Co. more than $4,000, and that of one company in which Biles was interested more than $5,000. Included in the bank's paper were notes of a firm, taken at various times between 1908 and 1911, amounting when the bank closed to more than $20,000—nearly

the bank's capital. On some of the notes no interest had been paid, but had been added every six months. A great deal of paper on hand when the bank closed consisted of "notes taken in lieu of overdrafts and carried for a number of years." The bank had a nominal surplus of nearly $13,000, apparently consisting largely of charged-up accumulations of unpaid interest. One director sold his stock about 1908, "because he did not think it a good investment, and did not think the bank in good condition." The stock was bought by the then president at par. Another director resigned in part because of dissatisfaction with "the indebtedness of Neuhardt and Browne." It is fair to say that this director seems to have wrongly understood that the bank was financing one of the corporations whose stock has been referred to as pledged by Browne to the bank. About 1910 some of the directors seem to have lost interest in the bank, and would only occasionally attend meetings. It is fairly inferable that this lack of interest was at least contributed to by the existence of the Handle Company item, if not by other matters. In March, 1912, and again in June of that year, the bank was trying to borrow money from banks with which it then had no connection. On July 25th its Memphis correspondent exacted from certain of the Chickasaw Bank's directors and principal stockholders (including Neuhardt, Biles, and Sparks) a personal guaranty to make good any and all losses accruing from the Chickasaw, Bank's insolvency, or growing out of any check or draft passing through the correspondent bank through the Memphis clearing house. In November and December of 1912 a depositor failed to get payment of certificates of deposit amounting to $2,000. One of the directors, who was on the guaranty to the Memphis correspondent bank, at Sparks' request loaned the Chickasaw Bank $6,000 five or six months before the failure. The same director on the day of the bank's failure refused to loan $5,000 to prevent suspension. The bank received deposits up to the time of the failure.

As to the alleged false reports[2] of the bank's condition: The report of December 30, 1911, includes in its cash resources $51,179.93 as "due from other banks and bankers"; loans and discounts were carried at $201,777.58; overdrafts, "secured and unsecured," at $1,078.81; stocks, bonds, securities, etc., at $20,988.86. Included in this latter item was the $10,000 of Rex Handle Company bonds and the $10,000 of that company's preferred stock. It appears that on the date the

---

[2] The Tennessee law and practice under which these reports were filed is this: All banks in Tennessee, except national banks, were required by statute to make and publish in a newspaper their financial condition on June 30th and December 31st of each year; severe punishment being provided for officials making in such reports as published "any false statement or representation of the financial condition" of the bank. It was the duty of the state comptroller to prescribe the form of such reports (Laws 1901, c. 44; Shannon's Supplement to Tennessee Code, pp. 362, 363); and although the filing of these semi-annual reports with the comptroller does not seem to have been required by statute (as were certain monthly statements provided for—Shannon's Code, § 3228), it seems to have been the practice to so file them and for the comptroller to keep them for public inspection, to be "sent out to inquiries showing the purported condition of the bank." The reports in question were mailed to the comptroller by the one preparing them.

statement was made $19,360 was taken from loans and discounts and turned over to the bank's Memphis correspondent, the cash "due from other banks" thereby increased in that amount, and the item of loans and discounts correspondingly decreased. The next business day the notes were restored to loans and discounts, and the correspondent bank credited with the amount stated. There is room for conclusion that the transaction was merely by way of increasing the showing of actual cash resources, and with the understanding that the deposit in the correspondent bank was for that purpose alone, and for the one business day only. It also appeared that the actual overdraft balances on individual accounts were more than $27,000 greater than carried in the report.

The explanation given by defendants who testified on the subject is that certain of the larger overdrafts belonged to a series of interlocking accounts held in the same interest or controlled by the one party, and that such adjustment of balances was proper. As to a portion of the items so adjusted there is evidence of the propriety of that disposition. As to others there is no direct evidence of authority to charge up the overdrawn account to that having a credit balance; and the evidence was such as, in some cases, to permit a conclusion that, while the interlocking accounts were controlled by one person, the latter had no knowledge of the overdraft adjustment referred to, and that no charge of the one account to the other was actually made. But, assuming that the so-called interlocking accounts were properly so adjusted, there still remained a substantial amount of overdrafts in excess of the amount at which the item was carried in the report; and it was open to fair inference that such decreasing of the showing of overdrafts was purposeful.

In connection with the report of June 29, 1912, the cash in the correspondent bank was increased, and the loans and discounts decreased, by a "wash" transaction of the same character as that in connection with the report of December 30, 1911, except that in the June report the amount was $9,000 greater than in the previous December report, and in that the notes in question were never entered on the books of the correspondent bank. In the June report, also, there was evidence of a reduction of overdrafts in the amount of more than $24,000, and largely in the same way as in connection with the preceding December report. In addition, there was testimony that certain large overdrafts were covered over the report day only by "wash" or "kited" transactions, and the items of cash on hand and due from other banks, and of funds in transit, increased by "kited" items and failure to charge up drafts drawn on the day the report was made.

In the report of December 31, 1912, there was testimony of decrease of overdrafts by means similar to those employed in the case of each of the other reports. There was testimony that funds in transit were increased $25,000, and that $10,000 thereof was apparently fictitious, the remaining $15,000 being represented by a draft drawn for the purpose only of increasing the item in the report; also that the item of certified and cashier's checks was decreased by $5,900, by crediting it to Nelson, cashier, instead of to the proper account. Each of the

241 F.—50

reports of June, 1912, and December, 1912, includes in stocks and bonds the $20,000 of the Rex Handle Company securities. In respect to each of the three reports there was testimony tending to show other more or less inaccurate statements. The report of December 31, 1912, was mailed to the state comptroller on the day before the bank failed. There was also testimony of a practice of issuing cashier's checks to the Biles firms, corporations, or members, regardless of overdrawn accounts; that a $10,000 certificate of deposit issued to Biles & Co., and used by them as collateral with another bank, was never entered upon the bank's books; and that on at least two occasions certificates of deposit, amounting each time to $10,000, were not entered until three months after they were issued.

Taking the entire record into account, we think there was substantial evidence tending to show that from December, 1911, to the day the bank closed it was in imminent danger of being compelled to suspend by reason of insolvency (its condition in January, 1913, does not seem to have been more than progressively worse than on December 30, 1911), and that all the defendants, unless it be Nelson, were more or less interested (at least for purposes of carrying therein paper on which they were liable) in keeping the bank alive, and thus in obtaining loans thereto by means of deposits or otherwise. It should be needless to say that neither the making of false reports by a state bank, nor the taking of deposits in such bank though insolvent, is within the federal statute, and that the gist of the offense charged is the use of the mails in aid of a scheme to defraud. The alleged misrepresentations as to the bank's condition are material only as they tend to show the existence of such fraudulent scheme.

As regards the reports of the bank's financial condition: It is true that the mere inclusion of the Handle Company's stock and bonds at their par value would not, standing alone, be very substantial evidence of an intention to misrepresent. It is also true that transferring paper to a correspondent bank for the purposes only of report day worked no change in the showing of net assets. But it is well known that the preserving of a due relation of available cash to deposits is, especially among banks and those acquainted with bank practices, regarded, and properly so, as material to safe banking, and thus to the appearance of solvency in the usual commercial and financial sense. The amount of quickly available cash items (as distinguished from cash on hand or in other banks) is also an important factor. It is also well known that a large line of overdrafts is looked upon with suspicion, and is an element of more or less danger; and when all the alleged misstatements and fictitious or colorable items are taken into account, in connection with the nonfluid nature of so large a part of the bank's assets, we cannot say that the record would not support a conclusion that some, at least, of the defendants knew that the bank was in imminent danger of suspension by reason of insolvency, and that the reports in question were purposely so made as to show a condition better than the facts warranted, and to mislead the public, thereby making possible the continuance of banking operations and the obtaining of loans by deposits or otherwise.

The question thus confronts us whether, as to any of the several defendants, we can say, as matter of law, that the evidence taken as a whole, was as consistent with innocence as with guilt. Tucker v. United States (C. C. A. 6) 224 Fed. 833, 837, 140 C. C. A. 279.

[4] As to Sparks, at least, we cannot so say. He was apparently a director of the bank, and during all the period in question, and for a considerable time before, was its active cashier, was continuously in the bank and passing on everything in a banking way. His paper had for several years been carried at the bank, and notwithstanding the latter's apparent need of funds his indebtedness to it was increased nearly $4,000 during the last year of its life. The record would support a conclusion that he was familiar with the bank's condition and with its paper generally and specifically, and was more nearly than any one else the bank's active manager. He was on the guaranty to the correspondent bank before referred to. He personally signed and swore to each of the three reports in question, mailing each of them to the comptroller, and there is no claim that he was unfamiliar with their contents. It was not error to submit to the jury the question of his guilt or innocence.

[5] As to Browne and Nelson the situation is quite different. Neither is shown to have had any connection with or knowledge of either of the reports, in question, or with any examination of the bank's assets. Neither signed the guaranty to the correspondent bank before mentioned. Browne had been a director previous to July 1, 1911, but there is at least a reasonable doubt, as the present record stands, whether he was a director during any part of the period covered by the alleged fraudulent scheme. He testified he was not, and the only evidence to the contrary which seems to be relied on by the government is the fact that he is named as a director in the bank's annual report for the year beginning July 1, 1911, and dated June 29, 1911, an abstract only of which report is in the record. But he is not shown to have had any knowledge of or connection with this report, which, standing alone, was incompetent evidence as to him. His name is omitted from the report for the year beginning July 1, 1912. He testified without dispute that he had never been a member of the bank's finance committee. His loans had all been contracted before 1910, and he had paid thereon $1,685 during the month previous to the bank's failure. The mere fact that at the cashier's request he adjusted his overdrafts on the two statement days in 1912 (once only temporarily) is not, we think, sufficient to justify a conviction of guilty participation in the fraudulent scheme charged.

[6] Nelson was not a director, or even a stockholder, in the bank. He is not shown to have had anything to do with its financial management, or to have had any duties except receiving and paying out money and keeping (in 1912) what is called the bank's journal, or to have had any knowledge of its financial condition, unless such as he might have gained from his keeping of the journal. But the nature of this journal, or whether or not it would disclose knowledge of the alleged insolvent condition of the bank, is not affirmatively shown. We do not understand the record to show that he ever owed the bank anything, or that he ever had a personal account with it. The only tangible evi-

dence against him is his connection with the kiting transaction before referred to; this we think not enough to justify a conviction of participation in the alleged fraudulent scheme. Upon the present record we think a verdict in favor of Browne and Nelson should have been directed, for inferences of guilt must be based upon facts tending to show it; even a moral probability cannot take the place of legal evidence. Wolf v. United States (C. C. A. 4), 238 Fed. 902, —— C. C. A. ——.

The cases of Goldbaum and Neuhardt, although differing in some features, may be considered together. Both were directors, Neuhardt since 1910, and Goldbaum since 1909; both were indebted to the bank. Neuhardt was during the entire of the years 1911 and 1912 the bank's president, although he did not spend much time at the bank, being engaged in the active practice of law. He never served on the finance or examining committees. Goldbaum, although not an officer, had served on the examining committee three or four times, and the record would support a conclusion that, although actively engaged in other business, he took a more active interest in the bank, and had more knowledge of its affairs, than the average director. Neuhardt was on the guaranty to the correspondent bank; Goldbaum was not.

The gist of the fraudulent scheme charged is the putting out of the false and misleading reports of the bank's condition, for the purposes stated. Goldbaum assisted in checking up the bank's affairs in connection with the making of each of the three reports, all of which he read and signed, although he testified he did not prepare, or help to prepare, either of them, and there was no evidence to the contrary. The certificate which he and the other two members of the committee signed was only that the committee had that day "counted the cash, examined the securities; and find the same in accordance with the above statement." The record does not affirmatively show whether Goldbaum's service in this connection involved, or would necessarily or naturally bring; knowledge of the actual fraudulent transactions alleged to have been had for the purpose of showing a condition better than the facts warranted—including the overdraft adjustments generally, the rediscounting of paper, and the kiting and other transactions before referred to—that is to say, whether or not those transactions were had before the committee examined and checked over the bank's affairs in connection with the making of the statements. If the record would permit an inference of such knowledge, there was no error in declining to direct verdict in his favor.

Neuhardt is not shown to have had any active connection with the making of either of the three reports, aside from the circumstance (claimed by him to have been merely incidental) that in the case of one of them he as a notary public administered the oath to Sparks; that he knew what was in the statements is matter of inference only as against his denial of such knowledge, which his official position did not necessarily impute to him. The evidence would tend to support a finding that he knew of the bank's imminent danger of insolvency, and the record is susceptible of an inference that he knew of the cashier's efforts to make a good showing, especially at statement time, and at least that he suspected, and perhaps tacitly approved, the nature of

the statements and the efforts adopted to make a good showing. There were, however, many facts and circumstances which militated in favor of his innocence of fraudulent conduct or intent, and which were consistent with mere earnest efforts to help pull the bank out of its difficulties. It, however, need not be said that efforts to keep a bank alive are not necessarily inconsistent with guilt of the offense charged. Methods employed to that end may make the difference between guilt and innocence.

As, for reasons later stated, the case must be tried again, and as the record on the new trial may be in some respects different, we find it unnecessary to decide whether or not, as the record stood at the conclusion of the trial had, verdict should have been directed in favor of Neuhardt and Goldbaum.

The remaining assignments relate to proceedings upon the trial.

[7] 2. Upon the argument to the jury, counsel for the government, after discussing the effect of character as a defense, and citing the good reputation of Benedict Arnold, before the discovery of his treason, said:

"So, gentlemen, in connection with bank cases, these men lived in honorable circles; these men have large acquaintances, and, by reason of the confidence people have in them, their power for good or evil is increased. We are aware, in connection with the savings bank, people with their little savings and their little earnings walk up with their tin buckets and lay their earnings upon the counter; they take it over there and make entries in the book; they go again, and after another day's work, another week or a month, carry in more earnings into this bank and deposit them."

Defendants' counsel objected to the argument as improper, as not an issue in the case, and as an appeal to the prejudice and passions of the jury. The court said that he understood counsel to be demonstrating or attempting to demonstrate the effect reputation and character of the bank's managers have upon its prosperity or otherwise, to which statement the government's counsel assented. The court not having ruled upon the objection, defendants' counsel remarked, "I take it your honor overrules the exception;" and associate counsel said, "We except to that remark about the tin bucket;" whereupon the government's counsel remarked, "These gentlemen seem to be out of sympathy with the tin bucket." To this latter remark defendant's counsel objected, on the ground that "there is nothing in the record to show that counsel is out of sympathy with labor." This argument and the remark of counsel for the government, in connection with the court's failure to sustain the objection thereto and to rule that the language was improper, is urged as reversible error.

[8] We may say, parenthetically, that we are not disposed to lay great stress upon the last retort of the government's counsel, standing alone, not only because the retort evidently related to counsel, rather than to defendants, but also because no exception was taken or request made for ruling or instruction on the subject.[3] But it accentuated the

---

[3] Chadwick v. United States (C. C. A. 6) 141 Fed. 225, 246, 72 C. C. A. 343; Dunlop v. United States, 165 U. S. 486, 498, 17 Sup. Ct. 375, 41 L. Ed. 799; Crumpton v. United States, 138 U. S. 361, 363, 364, 11 Sup. Ct. 355, 34 L. Ed. 958; Higgins v. United States, 185 Fed. 710, 716, 108 C. C. A. 48; Toledo, etc., R. R. Co. v. Howe (C. C. A. 6) 191 Fed. 776, 786, 112 C C. A. 262; O'Dell v. Tibbetts (C. C. A. 1) 212 Fed. 652, 655, 129 C. C. A. 188.

argument complained of. Had the court sustained the objection, and ruled the argument improper, we think reversible error would not have resulted. Kellogg v. United States (C. C. A. 6) 103 Fed. 200, 202, 43 C. C. A. 179; Dunlop v. United States, supra. And although the court did not rule upon the objection, or hold the language improper, reversible error was not committed, unless the matter objected to was "plainly unwarranted and so improper as to be clearly injurious to the accused." Chadwick v. United States, supra, 141 Fed. 225, 245, 72 C. C. A. 343; Johnston v. United States (C. C. A. 9) 154 Fed. 445, 449, 83 C. C. A. 299; Diggs v. United States (C. C. A. 9) 220 Fed. 545, 556–557, 136 C. C. A. 147. If subject to such characterization, such error was committed.

While the case presented is not of the extreme character of that involved in People v. Fielding, 158 N. Y. 542, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495, relied on by defendants, and in a case free from doubt on the merits the language complained of would not work reversal (People v. Fielding, supra, 158 N. Y. 550, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495), yet the less conclusive of guilt the evidence is the greater the danger of injurious effect from appeals to prejudice. It is a matter of common knowledge that jurors are, and not unnaturally, prejudiced against those charged with misconduct in connection with the affairs of a failed bank, and peculiarly susceptible to appeals to such prejudice, and while we should hesitate to say that the matter complained of, standing alone, would call for reversal, the question is close enough to the border line to warrant its consideration in connection with another matter of which complaint is made.

[9-12] 3. Defendants offered to show by defendant Sparks, who was a witness, that as cashier of the Chickasaw Bank he had a conference with Mr. Omberg, as president of the First National Bank of Memphis (the Chickasaw Bank's Memphis correspondent) in which Omberg told Sparks "not to fail or refuse to buy paper or make loans because it was a little bank, as the First National Bank would, whenever occasion arose, * * * take over any paper which the Chickasaw Bank had bought" that it did not desire "to own, either for a time or permanently"; that accordingly Sparks proceeded to make loans and discounts, relying on his correspondent to take them over when desired at statement times; that the correspondent did from time to time, as requested, take over such paper, which immediately after the statements were made Sparks took back, so as to get for the Chickasaw Bank the earnings on the increased loans, having previously explained to Omberg that, on account of the small capital of the Chickasaw Bank, it was desired not to have a showing made indicating such a large amount of loans, because the public, not knowing the arrangement, would not understand the situation. The witness was permitted to state that he had an arrangement with the correspondent bank by which the latter agreed to rediscount paper for the Chickasaw Bank at times when the latter needed it; but the court declined to permit the conversation with Omberg to be stated, upon the ground that the claimed arrangement would be no defense, regardless of whether or not Omberg knew of the alleged fraudulent purpose, and that "any reasons assigned by anybody leading up to that agreement" were incompetent.

In this ruling we think the court erred. The charge of "padding" the item of cash due from other banks for the purpose of the semi-annual statements was one of the strongest evidences of fraud relied upon by the government, and defendants were entitled to make the fullest explanation possible. Had the proffered evidence been limited to the bare fact that the arrangement for rediscounts related to statement day only, it would have been immaterial; but we think it had a tendency to show also that a larger amount of loans was taken by the Chickasaw Bank than otherwise would have been, in reliance upon the fact that its correspondent bank stood ready to take such excessive loans off its hands, not only over statement day, but whenever and for such length of time as the Chickasaw Bank might desire. While such arrangement cannot be commended as good banking, it had, we think, a tendency to repel to some extent the inference of fraudulent intent naturally to be drawn from the unexplained fact of carrying rediscounts over statement day only. Omberg's knowledge or ignorance of the alleged fraudulent purpose was immaterial, but the purpose of the offered testimony was to rebut fraudulent purpose. Proof of the actual conversation, so far as it bore directly upon the claimed arrangement, was not hearsay. It was the best evidence of the claimed agreement—pertinent to one of the main issues in the case. The bare statement of the witness that Omberg had said that they "would help us in case my loans became too heavy," and that the correspondent bank "agreed to rediscount" [paper] for him "if it became necessary," was a mere conclusion of the witness, and would not necessarily have the full probative effect of testimony of the actual statements made by Omberg, who was not present at the trial, and apparently not in the state at the time. We think defendants had the right to have the conversation given as it occurred, and thus the benefit of whatever persuasiveness of truth the actual language might carry. It is true that the reasons, if any, assigned by Omberg for making the arrangement, were not important; but the formal offer of proof was not subject to that criticism, and if the actual testimony, when presented, was so subject, that feature could readily be taken care of. Sparks could properly testify directly to the absence of fraudulent intent and motives on his part. Crawford v. United States, 212 U. S. 183, 205, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392.

[13] It is quite possible that the exclusion of the testimony in question was due in some measure to the failure of the court and defendants' counsel to understand each other, as indicated by colloquies and repeated exclusions of questions reframed to meet the court's announced views. But we cannot escape the conviction that defendants understood, and not unnaturally, that they were not permitted to make the full and complete proof to which they were entitled respecting the actual arrangement claimed. This denial would naturally prejudice, not only Sparks, but his codefendants; for, in view of his relations to the bank and to the arrangement in question, they could not have participated in a fraud of which he was not guilty. We are disposed to think that this prejudice would naturally be emphasized by what occurred during the subsequent argument, discussed in the preceding

paragraph of this opinion. We are constrained to believe that the cumulative effect of these matters worked reversible error.

This conclusion makes it unnecessary to consider whether counsel's comment on Nelson's failure to testify worked reversible error, in view of the court's action thereon.

[14] As the case must be tried again, we may add that we think it proper to show fully the actual value of the bank's assets at the time of the failure and during the period covered by the alleged fraudulent scheme.

[15, 16] Defendants assign a large number of other errors, none of which have been argued. Whether or not defendants' brief is to be construed as relying upon them, we do not feel called upon, in the absence of discussion (and in view of our disposition of the case otherwise reached), to determine whether the refusal of defendants' requests to charge constituted reversible error. But, as there is to be another trial, we may say that we think the jury should have been instructed that Neuhardt was not, by virtue merely of his office, charged with knowledge of the contents of the bank's books (Worden v. United States [C. C. A. 6] 204 Fed. 1, 8, 122 C. C. A. 315, et seq.), and that the mere fact that one of the reports was sworn to before Neuhardt, as notary public, did not, as matter of law alone, also charge him with knowledge of the contents of the report. We also think the jury should have been told the meaning of insolvency, as involved in the closing of the bank's doors under the state law, and that the mere fact of such closing and receivership did not necessarily mean that its liabilities exceed the fair value of its assets, having in mind, however, that the latter kind of insolvency is not necessary to the alleged fraudulent scheme. We also think defendants entitled to more definite instruction than was given upon the effect of an alleged good faith valuation by defendants of stock and bonds included in the report, as well as upon the subject of adjustments of overdraft balances.

[17] The instruction that, if defendants are guilty under the first count, they should be found guilty under all the counts, if not entirely accurate, was at least harmless, in view of the fact that the sentence given was imposable under either one of the counts. Claassen v. United States, 142 U. S. 140, 146, 12 Sup. Ct. 169, 35 L. Ed. 966; Bennett v. United States (C. C. A. 6) 194 Fed. 630, 633, 114 C. C. A. 402. We think the other exceptions to the charge as given are not well taken. Further than this we should not go without the benefit of counsel's discussion, in view of what may occur on the new trial.

The judgment of the District Court is reversed, and the cause remanded, with directions to award all the defendants a new trial.