# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS THE DISTRICT COURTS, AND THE COMMERCE COURT

---

### WORDEN et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. April 11, 1913.)

### No. 2,213.

**1.** PUBLIC LANDS (§ 135*)—PURCHASE FROM UNITED STATES—SALE BY ENTRY-MAN.

The Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]) does not forbid an entryman, who in good faith has acquired a holding under such act, to alienate his interest in the lands prior to the issuing of a final certificate; the only transaction denounced by the act being a prior agreement by which the entryman acts for another in the purchase of the land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 351–362; Dec. Dig. § 135.*]

**2.** PUBLIC LANDS (§ 135*)—ENTRIES—TIMBER AND STONE ACT—PURCHASE FROM ENTRYMAN.

It was not improper for a lumber company located in the vicinity of land subject to entry under the Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]) to advertise that it wished to buy timber, to loan money to entryman, to purchase incomplete entries made in good faith, and to pay the money required on final proofs, so long as there was no arrangement and understanding between the company and the entryman in the beginning that the company should ultimately acquire the land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 351–362; Dec. Dig. § 135.*]

**3.** CRIMINAL LAW (§ 371*)—EVIDENCE—OTHER OFFENSES—CONSPIRACY—INTENT.

Where, in a prosecution for conspiracy to defraud the United States in the purchase of public lands under the Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), the government claimed that the two entries pleaded and the purchase thereof by defendants were part of a broader underlying conspiracy to procure public lands in fraud of the act, and there was testimony substantially tending to sustain that contention, evidence of the making of 27 other entries traced ultimately to defendants or a lumber company operated by them was admissible as bearing on defendants' good faith.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830–832; Dec. Dig. § 371.*]

**4.** CRIMINAL LAW (§ 417*)—EVIDENCE—DECLARATIONS—HEARSAY.

In a prosecution for conspiracy to defraud the United States out of public lands under the Timber and Stone Act (Act June 3, 1878, c. 151, 20

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

204 F.—1

Stat. 89 [U. S. Comp. St. 1901, p. 1545]) by means of alleged prior agreements with entrymen to purchase the lands, assertions by the entrymen contained in their final proofs that the purchases were not being made for any other person were admissible on the question of defendants' good faith, notwithstanding the entrymen were not required to make them, and they could not have furnished a basis for a prosecution for perjury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 950–967; Dec. Dig. § 417.*]

5. CRIMINAL LAW (§ 417*)—EVIDENCE—OPINION—HEARSAY.

In a prosecution for conspiracy to defraud the United States out of public land entered under the Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), expressions of opinion by entrymen as to the value of the lands they were buying were irrelevant, except so far as defendants could be shown to have been responsible therefor.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 950–967; Dec. Dig. § 417.*]

6. CRIMINAL LAW (§ 422*)—EVIDENCE—CODEFENDANTS—BOOKS OF ACCOUNT.

In a prosecution against two defendants for conspiracy to defraud the United States out of public lands, the books of one of the defendants, showing alleged advances to entrymen of land subsequently conveyed to the defendants or a corporation operated by them, while admissible against the defendant, whose books they were, were not competent evidence against his codefendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 984–988; Dec. Dig. § 422.*]

7. CRIMINAL LAW (§ 434*)—EVIDENCE—BOOKS OF CORPORATION.

While books of a corporation are admissible against it in a criminal proceeding, when the entries are in the nature of admissions without the necessity of strict authentication beyond establishing their identity, and also are competent against the managers of the corporation on proof of their connection and familiarity with the books so as to justify an inference of actual acquaintance with their contents, yet the books of a corporation were inadmissible against its president and superintendent, in a prosecution against them for conspiracy to defraud the United States of land entered under the Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), to show advances alleged to have been improperly made to entrymen for land subsequently conveyed to the corporation, in the absence of any proof that defendants had anything to do with the keeping of the books, or had any knowledge of their contents.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1023; Dec. Dig. § 434.*]

In Error to the District Court of the United States for the Western District of Michigan; Arthur C. Denison, Judge.

James H. Worden and Alexander Gustaf Person were convicted of conspiracy to defraud the United States in the purchase of certain public lands, and they bring error. Reversed and new trial ordered.

F. P. Sullivan, of Sault Ste. Marie, Mich., and C. A. Withey, of Reed City, Mich., for plaintiffs in error.

F. C. Wetmore, of Grand Rapids, Mich., for the United States.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SANFORD, District Judge.

KNAPPEN, Circuit Judge. Plaintiffs in error and one Duell were jointly indicted under section 5440 of the Revised Statutes (U. S.

Comp. St. 1901, p. 3676) on a charge of conspiracy to defraud the United States in the purchase of certain public lands under the Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]). The gist of the fraud charged in the two counts submitted lay in the procuring of the lands through alleged "dummy" entrymen (one Mrs. Craig and one Alexander) by false and fraudulent representations contained in the respective applications for purchase and in the final proofs, to the effect that the applicant had no agreement or contract with any one whereby the title which he might acquire from the United States should inure, in whole or in part, to the benefit of any one except himself; it being alleged that the purchases were intended for the benefit of plaintiffs in error, said Duell, one Simonds, and the J. H. Worden Lumber & Shingle Company, which we shall hereafter call the Lumber Company.

January 1, 1906 (or 1905), Worden purchased a sawmill plant in Trout Lake township, Chippewa county, Mich., 38 miles from Sault Ste. Marie, the postoffice being called "Dick." He remained owner until some time in August, 1906, when the Lumber Company was incorporated under the laws of Wisconsin. Worden was thereafter president and manager of the company. Person was superintendent for Worden after January 1, 1906, and until the Lumber Company was organized. Thereafter he held the same relation toward the company until December, 1906, or January 1, 1907, when he retired. Duell entered the employ of Worden, or of the Lumber Company, in the summer of 1906, being in the company's employ after its organization. He looked after the office and store and kept the books, and was assistant postmaster. January 1, 1907, on Person's retirement, Duell became superintendent. Simonds was a land looker and timber estimator for Worden up to the Lumber Company's organization, and thereafter acted for that company. Simonds died before the indictment was returned. Upon the trial Duell was acquitted; Worden and Person were convicted. The denial of request to direct verdict for defendants, and the admission of certain evidence complained of, require reference to some features of the testimony.

Mrs. Craig's application was signed July 31, 1906. She executed final proofs October 24th of the same year, and on December 17, 1906, conveyed to the Lumber Company the lands covered by her entry. Alexander's application was dated August 24, 1906, his final proofs were executed November 28th, and on December 9th of the same year he conveyed to the Lumber Company the lands so purchased. Duell was a witness under Mrs. Craig's application, and Simonds was a witness under the application of Alexander. Entries on the books of Worden or of the company, or both, in connection with expert testimony, tended to show the advancement of money to pay the expenses of both applicants and their witnesses to Sault Ste. Marie, when the entries were made, as well as for paying the government fees upon application and the moneys required to be paid on final proofs. The book entries also tended to show that not only the moneys advanced to pay the government for the land, but also (in the case of at least one of the applicants) the moneys advanced

for expenses connected with the making of application were deducted from the amount paid the applicant on conveyance to the Lumber Company. Twenty-seven other entries for purchase under the Timber and Stone Act were made between May 7 and November 15, 1906, principally by employés of the Lumber Company, or their wives or near relatives, including Duell, Person, and Simonds. Duell was a witness under 5 of these applications, Simonds in 18 cases, and Person in 5. Other employés of the Lumber Company acted as witnesses in still others of those applications. In many cases several of the applications were presented at Sault Ste. Marie on the same day. Each of these 29 applications, as well as the final proofs thereunder, contained the applicant's statement negativing the existence of any agreement or contract with any person whereby the title to be acquired from the United States should inure to the benefit of any one except the applicant. The books of account referred to tended to show that advances were made to a majority of the 27 other applicants on or about the dates of the signing of their respective applications for purchases from the government, and that payments were made to many of them on or about the date that final proofs were executed. Nearly all of them are affirmatively shown to have conveyed to the Lumber Company the lands so purchased soon after making final proofs. In the case of some at least, the book entries, in connection with the expert testimony, tended to show that the amounts so advanced, both at the dates of signing the applications and at the times when final proofs were executed, were deducted from the purchase price paid by the Lumber Company for the lands. The government produced none of these 29 applicants as witnesses. Two of them (other than Alexander and Mrs. Craig), as witnesses for respondents, testified to the absence of any agreement or understanding with respondents, or either of them, prior to the making of their respective applications. Person testified to his ignorance of anything "crooked" with reference to any of the land purchases in question; that he gave no encouragement to any of the entrymen to take up any of the lands in question; that he made his entry on his own account, and sold it to Worden personally only upon severing his connection with the company. Worden and Duell were not sworn upon the trial, but their affidavit, taken by an examiner of the Government Land Office during the investigation, contained a denial of the advancement of money to any of the claimants, "directly or indirectly, for the purpose of making timber and stone entries of government lands," or to any one for expenses in going to Sault Ste. Marie to make filings or final proofs.

[1] The rule is well settled that the Timber and Stone Act does not forbid an entryman who has in good faith acquired a holding under the act to alienate his interest in the lands prior to the issuing of final certificate. All the act denounces is a prior agreement by which the entryman acts for another in the purchase. United States v. Budd, 144 U. S. 154, 163, 12 Sup. Ct. 575, 36 L. Ed. 384; Williamson v. United States, 207 U. S. 425, 460, 28 Sup. Ct. 163, 52 L. Ed. 278; United States v. Biggs, 211 U. S. 507, 519, 29 Sup. Ct. 181, 53 L. Ed. 305.

[2] This rule was clearly recognized and applied by the trial judge, who properly instructed the jury, among other things, that the Lumber Company had a right to give it out that it wished to buy timber, and that it had the right to loan money to the entryman (so long as there was no arrangement or understanding that the company should ultimately get the land), and had the right to purchase incomplete entries made in good faith, and to pay the money required on the final proofs.

In our opinion the testimony was sufficient to sustain a conviction of both plaintiffs in error, provided the books of account and the record of the 27 other applications for land purchases are to be given the force which the government claims for them. The Budd Case, before cited, is not opposed to this conclusion. That case (which was a suit to cancel a patent) differs from the instant case, in that there was in the Budd Case nothing directly connecting the entryman's vendee with the original entry, or showing that the entryman or his vendee even "knew of the existence of the other until after the entryman had fully paid for the land."

[3] We think it was competent for the government to show the making of the 27 other entries. The defendant's good faith in the Alexander and Craig transactions was the crucial question. It was the government's theory that these two entries and the purchase thereunder were part of a broader underlying conspiracy to procure public lands in fraud of the provisions of the Timber and Stone Act, and we think the testimony substantially tended to sustain that contention. The rule in such cases is that proof of other acts of a similar character at or about the same time, and with like alleged fraudulent purpose, may be shown as bearing upon defendants' good-faith conduct with respect to the particular offense charged, provided the ultimate effect of such evidence as to other transactions is clearly limited to the question of intent or good faith with respect to the particular offense for which the defendants are on trial. New York Mutual Life Ins. Co. v. Armstrong, 117 U. S. 591, 598, 6 Sup. Ct. 877, 29 L. Ed. 997; Wood v. United States, 16 Pet. 342, 360, 10 L. Ed. 987; Olson v. United States (C. C. A. 8), 133 Fed. 849, 854, 67 C. C. A. 21; Sapir v. United States (C. C. A. 2), 174 Fed. 219, 98 C. C. A. 227. The Budd Case does not conflict with this rule or with its application here. What was there said regarding evidence that the purchaser from the entryman in question had made with another entryman, prior to the latter's entry, an agreement to purchase the land so entered, had special reference to the probative force of such fact considered in connection with all the evidence in the case. In the instant case the jury was instructed that these other entries were admitted "only for the light that they may throw upon the question as to whether the Craig and Alexander entries * * * were made in good faith by these people for themselves or were made really for the company." The basic theory upon which the statements made by the 27 other entrymen were admissible is that the defendants induced, and so were responsible for, and were practically themselves the makers of the statements. In this view the alleged falsehoods by

the other entrymen were material, not because they falsified, but so far as their falsehoods can be deemed the falsehoods of defendants. It is perhaps not strictly accurate to say that the statements of the other entrymen bore directly upon the question of the good faith of Alexander and Mrs. Craig. But the distinction is academic. They were pertinent to defendants' good faith, which is the important question.

[4] We therefore think the trial judge rightly held that the assertions contained in the final proofs of the various entrymen, that the purchases were not being made for any other person, might properly be considered upon the broad question of good faith, notwithstanding such assertions were not lawfully required, and could not have furnished basis for prosecution for perjury.

[5] But expressions of opinion by the entrymen, obviously based on hearsay alone, as to the value of the lands they were buying were irrelevant, except so far as defendants may be shown to be responsible for such opinions. It may be that a broader evidential effect was permitted to these statements than we think them entitled to; but, in view of the disposition to be made of the case it is unnecessary to pursue this subject further.

[6] The books of account played an important part on the trial. Worden's books, kept before the company was formed, were, as against him, competent evidence of the making of the alleged advances to entrymen. But the books were not, from the fact alone that they were Worden's, competent evidence against Person. The question of the competency of the company's books affects both plaintiffs in error. The importance of the books, both of Worden and of the company, appears from the facts that (a) they furnished the only evidence there was of actual advances of money to any entryman for preliminary expenses (as distinguished from final payment to the government for the lands), whether for traveling to Sault Ste. Marie, for government fees, or otherwise; and (b), if the evidence afforded by the books were eliminated, the proof, in our opinion, would have been insufficient to support a conviction of plaintiffs in error, having in mind the necessity of unlawful agreement, prior to application for purchase. The books of the company (as distinguished from Worden's) are important, because, while the alleged advances and payments before the company's organization were entered upon books which were then Worden's, yet of the 29 entries in question the last 7 complete (numbering chronologically), as well as all payments to entrymen made subsequent to the filing of application from and including the eighth entry (which is prior to those of Alexander and Mrs. Craig), were made after the corporation was formed, and presumably were entered on books which then belonged to the company. Such payments included alleged advances for preliminary expenses to two entrymen, one of whom was an employé, the other the wife of an employé of the company.

[7] Were the corporation the opposite party here, entries on its books would be competent evidence when in the nature of admissions, and without the necessity of strict authentication beyond establishing the identity of the books. Foster v. United States (C. C. A. 6),

178 Fed. 165, 175, 101 C. C. A. 485, 495, and authorities cited. The corporation, however, is not here the opposite party; there was no affirmative proof that the books were correctly kept; and while the rule is well settled that entries in the books of a corporation showing dealings between it and its managers are competent evidence against the latter, even in a criminal prosecution, on proof of such connection and familiarity with the books as to justify an inference of actual acquaintance with their contents, as being admissions or assertions of the facts stated therein (Foster v. United States, supra; People v. Leonard, 106 Cal. 302, 39 Pac. 617; Olney v. Chadsey, 7 R. I. 224; Bacon v. United States, 97 Fed. 35, 40, 38 C. C. A. 37), yet such is, we think, the only theory on which the entries in question can be held competent evidence against the defendants. State v. Ames, 119 Iowa, 680, 684, 94 N. W. 231; Lang v. State, 97 Ala. 41, 46, 12 South. 183; Bartholomew v. Farwell, 41 Conn. 107, 111.

The record, we think, fairly presents the objection that sufficient connection was not shown between defendants and the books of the Lumber Company to make the book entries competent evidence. The learned judge, early in the trial, recognized the necessity of connecting the defendants with knowledge of the books. In overruling a motion to strike out certain testimony of erasures, the court said:

"I should say in that connection, if there is any erasure that it is not proof of anything of itself; it is of no importance unless respondents or some of them are responsible for the erasure."

Did the court hold the book entries competent evidence against plaintiffs in error? In overruling an objection on the ground of incompetency and immateriality and otherwise, the court said of the entries:

"Their exact force, as evidence, will be ruled upon hereafter in the course of the charge to the jury if not before."

Later when it appeared that the Lumber Company's books were not presented by the defendants, their counsel said:

"If they were not produced by these respondents and the books were of some concern, which is not under indictment, then I object to them as incompetent and the erasures—"

The court thereupon ruled:

"*The whole question of what these books show against these respondents, if anything, must be finally considered by the jury in connection with the relation of the respondents to the Worden Lumber Company, and if it appears that the respondents acted in the management of the Lumber Company, and that one or more of them acted in the keeping of these books, then the jury may give them such force as the facts justify.*"

Exception was taken to this ruling. The charge contained no instruction whatever as to the competency or evidential force of the books, except the statement that:

"Such evidence as there has been about erasures on books and records * * * you may give such force as you think proper in bearing on the general conclusion which you reach."

The court, however, in the course of the charge, used this language:

"Now, assuming that you believe what is shown by the books of the Worden Company, it appears that on or about the day when these two people [Alexander and Mrs. Craig] made their respective entries the Worden Company furnished or provided or loaned the amount of money necessary to pay the expenses of making the entries"

—this remark being followed by reference to the subsequent bookkeeping entries showing the ultimate disposition of the advances to Alexander and Mrs. Craig, according to the court's "inference from the bookkeeping that was done." The fact that no exception was taken to the paragraphs of the charge which we have quoted is not controlling. If there was error in the rulings made on the trial with reference to the competency of the bookkeeping entries, what was said in the charge (in connection with the omission to give further instruction as to the competency of the book entries) emphasized and gave prejudicial effect to those rulings.

While (unless by the above paragraph which we have italicized in full) the court made no express ruling that the proofs were such as to make the book entries competent evidence against the defendants, we are constrained to think that the language referred to (and in view of the fact that defendants were shown to have participated in the management of the company, and that one of them, although not one of the plaintiffs in error, took part in the bookkeeping) may well have been understood by the jury (although perhaps not so intended) as a ruling that the bookkeeping entries would be, in the contingency stated, competent evidence against plaintiffs in error. See F. C. Austin Mfg. Co. v. Johnson (C. C. A. 8th Cir.) 89 Fed. 677, 683, 32 C. C. A. 309.

The facts referred to did make the bookkeeping entries competent as against Duell; they were not alone sufficient to make them competent as against plaintiffs in error. The ruling, we think, constituted prejudicial error unless the evidence, taken together, justified a ruling that the bookkeeping entries were competent evidence against plaintiffs in error. This brings us to the question whether the proofs were such as to justify treating the book entries, including not only the original but transfer entries, competent evidence against defendants here complaining on the basis of admissions or assertions by them.

It clearly appears that Person had nothing to do with keeping the books. He was simply superintendent, and there is nothing to indicate that he knew anything about bookkeeping or that he paid any attention to it, or that he directed any of the entries in question. Moreover, he severed his connection with the company as early as January 1, 1907 (if not earlier), and a large number of the bookkeeping entries .put in evidence (including those claimed to show that payments, at or before the execution of final proofs, were made to at least five entrymen) are later than that date, although the applications of the entrymen for land purchases were all made before Person retired. The showing was not such as, in our opinion, to justify a

ruling that the bookkeeping entries were competent evidence against him. Person was thus prejudiced even if (as is not quite clear) he failed to save the question of the competency of Worden's books. As to Worden: There is no evidence that he had at any time anything to do with the bookkeeping, or even that he ever looked at the books. The only testimony as to his visits to the plant, including the office where the books were kept, is that he "came to Dick once or twice a month; he would come one day and go the next; he was looking after the Wisconsin Bark & Lumber Company, at Antigo, Wis." The record is consistent with the existence of this situation as to infrequency and briefness of visits until some time after the end of 1906, before which date all alleged payments to Mrs. Craig and Alexander had been made, as well as the great bulk of all the other alleged payments to entrymen. We infer Worden did not live at Dick during any of the time. Person said he was "in the habit of receiving checks from Worden two or three times." Person further says he "cashed these checks and brought the money to the office to be used in our business." The affidavit of Duell and Worden stated that arrangements for conveying the lands to the company were made by Person (except in the case of two purchases, which were made by Worden, presumably), the amount going to each of a large number of claimants being paid by checks signed by Worden, except that in cases where a claimant was indebted "to the company for supplies or money advanced on his wages the amount was deducted from the purchase price of the land." This manifestly could apply only to employés who were paid monthly.

When we consider that the pivotal question of defendants' guilt or innocence was the making of bargains with the entrymen previous to their entries, and that the giving of checks or furnishing of money to pay the Government price of the lands on final proof (which is the first connection Worden personally is shown to have had with the transactions) was not unlawful, it is obvious that the language of the various entries, the bookkeeping treatment of the same by posting and otherwise, the ultimate alleged deduction of the original advances from the amounts paid for the lands, are quite as important as the mere fact of the actual furnishing by the Lumber Company of the money used in making the land entries. It is manifest that Worden would be prejudiced by an improper treatment of the entries on the company's books as competent evidence against him. Unless the mere fact of Worden's presidency and management of the company raised a legal presumption of his acquaintance with the book entries, thus putting upon him, in defense of a charge of crime, the burden of rebutting such legal presumption, we think the books cannot, in the peculiar state of this record, be held as matter of law competent evidence against him. We have found no persuasive decision sustaining such legal presumption (in the absence of statutory requirement of correct bookkeeping) except on proof that the books were kept under the instruction, direction, or supervision of the person against whom the entries are offered, or that such person presumably had examined the books or in some way obtained actual knowledge of the entries.

We think that even as to Worden the instant case is distinguishable from cases like Bacon v. United States, where, in a criminal prosecution of the president of a national bank for making false reports of the bank's condition, the bank's books were held competent evidence for the government to show the actual condition of the bank, not only because the defendant was its chief executive officer, and, as such, actually had control and direction of its affairs, but also because the act of Congress enjoined, under severe penalties, that its books should be truthfully kept, so justifying a presumption that they had been so kept; also from People v. Leonard, supra, where, in a prosecution of a bank officer for embezzlement, it was held (under the peculiar facts of the case showing defendant's relations to the bookkeeping) that entries on the bank's cash book were prima facie evidence of the balance of cash on hand; also from Bird v. Magowan (N. J. Ch.) 43 Atl. 278, where, in a suit by a receiver of an insolvent corporation against its officers, to recover moneys fraudulently diverted, the account against one of the defendants was, under the proofs, held evidence as an admission. The case differs also from Foster v. United States, supra. In that case there was no objection to the books on the ground that the entries in question were not properly authenticated. What was there said (178 Fed. 176, 101 C. C. A. 485) as to the relations of the defendants to the books was by way of support to the proposition that the government might have been able, had such objection been made, to supply authenticating proof. The fact that the bookkeeper (Duell) was also indicted did not on mere proof of his handwriting make admissible, as against plaintiffs in error, entries otherwise incompetent.

We therefore think the evidence did not justify a ruling that the entries on the company's books were competent evidence as against Worden. As we construe the record, their competency was not made to depend upon a finding by the jury of his actual acquaintance with the contents of the books, and with the entries involved. Whether the submission of such question of fact would have been justified we need not decide as the evidence on another trial may or may not be the same.

It is suggested in brief of counsel that the indictment was barred because certain of the entries (aside from those of Alexander and Mrs. Craig) antedated the three-year period of limitation; but we see no merit in this suggestion.

The questions raised by the remaining errors assigned seem scarcely likely to arise on another trial, and we therefore refrain from discussing them.

For the errors pointed out, the judgment of the district court must be reversed and a new trial ordered.