McDONALD et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.   May 8, 1917.)

No. 2609.

1. CRIMINAL LAW ☞753(2)—DIRECTING VERDICT—EVIDENCE TO SUPPORT ONE COUNT.
   Where there is evidence to support any one count, and the sentence imposed is not more than the law permits to be imposed under one count, the refusal to direct a verdict is not error.

   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1727, 1729.]

2. POST OFFICE ☞50—FRAUDULENT USE OF MAILS—QUESTIONS FOR JURY.
   In a prosecution for using the mails in furtherance of a scheme to defraud, by selling stock in and getting deposits for a bank by false representations about its capital and assets, where it appeared that one of the defendants furnished a mercantile agency with a statement which was vitally untrue, but he claimed that he merely gave out what he had been told by others connected with the bank and believed it to be true, the issue of his good faith or fraudulent intent was for the jury.

   [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89.]

3. POST OFFICE ☞35—FRAUDULENT USE OF MAILS—INTENT.
   In such prosecution, where the proof showed a number of transactions, which might be interpreted either as careless, improvident, or reckless banking, or as steps in a scheme to misappropriate the assets of the bank, and defraud it or its creditors, the actual intent and the actual belief of defendants as to each transaction was the criterion on which their guilt depended.

   [Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55.]

4. CRIMINAL LAW ☞830—INSTRUCTIONS—ERRONEOUS REQUESTS.
   In such prosecution, defendants were entitled to instructions that their guilt must be judged by their actual intent to defraud, rather than by their carelessness or recklessness in banking, or violation of banking laws, though the instructions requested by them went too far, so that their refusal was technically justified.

   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2012, 2017.]

5. CRIMINAL LAW ☞829(3)—INSTRUCTIONS COVERED BY THOSE GIVEN.
   Requested instructions that defendants' guilt was to be judged by their actual intent to defraud, rather than by their carelessness or recklessness in banking, or violation of banking laws, were not sufficiently covered by the general charge, in which the jury were told to find defendants not guilty if the acts and statements of the officers, directors, or owners of the bank were consistent with the conclusion that it was defendants intention to organize and operate the bank in good faith and for an honest purpose, especially where the court, in ruling on evidence, ruled that defendants' belief was not important, unless it was well founded, and that their carelessness might make them guilty.

   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011.]

6. CRIMINAL LAW ☞1173(2)—APPEAL—HARMLESS ERROR—INSTRUCTIONS.
   The failure to charge that defendants' guilt must be judged by their actual intent to defraud, rather than by carelessness or recklessness in banking, or violation of banking laws, was not prejudicial as to a defendant shown without dispute to have written letters soliciting stock purchases or deposits, and containing false statements as to the capital stock paid in, and shown to have mailed a semiannual statement, re-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

quired by law, which was false in almost every particular, where no plausible justification of such statements was attempted.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3165.]

7. CRIMINAL LAW ☞1173(2)—APPEAL—HARMLESS ERROR—INSTRUCTIONS.

The failure to so charge was prejudicial as to a defendant against whom no false statement was shown, except one furnished a mercantile agency, as to which his claim of good faith was a question of fact.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3165.]

8. CRIMINAL LAW ☞1169(7)—POST OFFICE ☞49—FRAUDULENT USE OF MAILS —EVIDENCE.

On a trial for using the mails in furtherance of a scheme to defraud in connection with sales of bank stock, and the obtaining of deposits and credit for such bank, evidence of an embezzlement by one of the parties to such alleged scheme, while connected with a different bank, against whom the case had been discontinued, was irrelevant and prejudicial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3142; Post Office, Cent. Dig. §§ 84–86.]

9. CRIMINAL LAW ☞424(1)—EVIDENCE—DECLARATIONS OF CONSPIRATOR.

The statement by a party to an alleged scheme to defraud, in further-ance of which the mails were claimed to have been used, after such scheme was at an end, was erroneous as against other parties to such scheme, even if the rule of evidence in conspiracy cases was to be applied.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1002, 1006, 1008, 1010.]

10. CRIMINAL LAW ☞434—EVIDENCE—DOCUMENTARY EVIDENCE.

The contents of the books of an incorporated bank were not admissible in a criminal prosecution against the president, without a showing of his personal responsibility for the bookkeeping.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1023.]

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

J. M. McDonald and E. L. Hendrey were convicted of offenses, and they bring error. Reversed and remanded as to Hendrey, and affirmed as to McDonald.

Caruthers Ewing, of Memphis, Tenn., for plaintiffs in error.

Wm. D. Kyser, Asst. U. S. Atty., of Memphis, Tenn.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. Plaintiffs in error were, with six others, indicted under section 215 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [Comp. St. 1916, § 10385]) for using the mails pursuant to a scheme to defraud. One of the respondents was never found, one pleaded guilty, two were discharged at the trial upon a nolle prosequi, two were acquitted by the jury, and the two plaintiffs in error were convicted. The indictment contained five counts, each resting upon the same alleged scheme, but each involving the mailing of a distinct letter. The indictment is very prolix, and it is by no means easy to identify, out of the mass of evidential things recited, the scheme which was intended to be charged. The trial also reveals confusion as

to what this charge was. However, the respondents proceeded without objection to the indictment for vagueness and uncertainty, and we are required to construe it as best we may, and review the case from the standpoint of that construction.

Respondent Sims (who pleaded guilty) formerly resided in Kansas City, Mo. He was a man of some banking experience, and, so far as the record shows, of good reputation. He devised a plan for organizing a company, which should be called a bank, but which in substance should be a holding company or a chain of banks, so that it should receive such of the earnings as were paid as dividends, and should also make profit by acting as depositary, correspondent, etc., for its constituent banks. Intending to start the enterprise at Chattanooga, he was diverted, more or less by chance, to Memphis. He interested in his plan Bonds, a banker at Kansas City, and Hendrey, a banker at Memphis. These three, with three others who did not expect to be stockholders, but signed only as an accommodation, joined in the organization papers of a Tennessee corporation named the "American Trust Company," and, under the Tennessee law, they constituted the board of directors until there should be an election. No one of them subscribed for capital stock, such subscription being unnecessary under the Tennessee law. The company had an authorized capital of $500,-000. This was on February 14, 1911. It was Sims' plan that part of the stock should be issued in exchange for the controlling stock of small banks, which would go into the treasury of the holding company, and that, upon these stocks so held, money could be borrowed, with which other stocks could be purchased, etc., and that the deposits and balances of the constituent banks would furnish working cash capital —all to the end that it would not be necessary to sell for cash any great part of the stock. Already Sims had interested McDonald, who controlled three small banks in the Southwest, and Hilton, who had one. McDonald turned in his equity in his stock in the three banks and received the American Trust Company's stock, as did also Hilton with reference to his bank. Defendant Hendrey says that he never agreed to nor did subscribe, except by signing the organization papers, never turned over any bank stock, and never received any trust company stock. There was no formal election. Stationery was printed showing McDonald to be president, Sims treasurer, and these two, with Hendrey and others, to be directors. In fact, Sims and McDonald began to try to sell stock and handle some paper. They thereafter gave their time to the enterprise. It had no cash paid in, but for itself or in Sims' name borrowed promotion expenses from Hendrey's bank, until—to Hendrey's alleged surprise—the loan had mounted up to $12,000. In the end, all stock-selling efforts were without success. About the 1st of June it was determined to open as an ordinary bank of deposit, and advertisements were published and deposits received. The bank survived only until August 8th.

The indictment alleges that the whole scheme of organization was fraudulent from the beginning, and that all the dubious steps afterward taken were in original contemplation as part of the scheme. Detached sentences in the charge to the jury seem to imply that, unless the re-

spondents were guilty of this original underlying scheme, they must be acquitted. A review of the record convinces us that no conviction upon this distinct theory could be sustained. The record is insufficient to support the conclusion that the respondents, at and before the organization of the company, or at the date shortly thereafter when McDonald and 'Sims began to push it, had any scheme or plan to defraud, or any intention, except to organize and prosecute an enterprise which, while highly speculative, did not contemplate the defrauding of any one. If this were the only theory upon which conviction could stand, we should agree with respondents' counsel that it could not be sustained.

It was not the only theory. United with this in the indictment and throuhgout the trial and in the judge's charge was the idea of a scheme to defraud consisting in an attempt to sell stock and to operate by getting deposits and credit for the bank through means of false representations about its capital and assets, or, what is practically the same thing, to maintain its standing and keep it up as a going concern by means of similar classes of false representations. The indictment may be fairly interpreted as charging, also, such a scheme; the testimony was mainly devoted thereto; and the charge, taken as a whole, must have indicated to the jury that there could be a conviction based upon a scheme formed after the organization of the company. If there was evidence to support this theory, the respondents' requests for directed verdicts were rightly refused.

[1] So far as concerns the refusal to direct a verdict, it is evident, also, that this would not be error, if there was evidence to support any one count, since the sentence imposed was not more than the law permitted to be imposed under one count.

Upon the theory of the indictment which we have approved, it is not to be denied that the case against McDonald was for the jury. His active participation in the circulation by mail of false representations about the capital stock and assets of the bank, and with the purpose of getting deposits and credit for it, are conceded by him. His excuses and justifications, and his claims of good faith in intention, were, to say the least, not convincing.

As to Hendrey the situation is different. He had no ostensible connection with the bank, except that his name appeared as a director. He claimed not to be a stockholder. He claims he had nothing to do with the management and took no interest, excepting as a creditor; but this is in dispute. We see nothing here from which it can fairly be said that he was a party to the scheme to sell stock by means of direct false representations to those who might purchase, or that he caused the mails to be used in sending the letters written by Sims or McDonald in the course of specific efforts to get particular persons to buy stock. However, two of the counts depend upon letters which were sent to other banks soliciting business, and one count rests upon a letter inclosing a statement of assets and liabilities to a mercantile agency. These three letters were sent by Sims or McDonald, and, so far as we observe, there is nothing to make Hendrey responsible for the mailing of any one of the three, unless upon the theory that these things were so likely to be done by the active managers in carrying out

the scheme that any party to the scheme should be regarded as having authorized them to be done for him on the general principles of agency.

Our opinion in Sparks v. United States, 241 Fed. 777, —— C. C. A. ——, filed this day, describes a situation where the use of the mails by those active in the bank management was for the purpose of transmitting a statement required by law to be sent to a state officer and customarily forwarded by mail. In such a case it might be that this use of the mails would so far fall within the implied authority given to the management by the directors as to make them responsible under section 215, upon the theory that they caused the mails to be used. We are not prepared to say that a jury might not apply the same principle, so as to make Hendrey liable in this case for using the mails, upon one of these three counts. We prefer to leave that question undecided. The record is very long, and has not been printed, and we can never be confident that a decision finding there was no evidence sufficient to support a proposition of fact may not overlook some item somewhere in such a record. The attention of the court and counsel do not seem to have been particularly directed upon the trial to this point; and upon the new trial which is to be awarded to Hendrey the record upon this point may be so different from the present record that, for the purposes of this opinion, we will assume that there was evidence sufficient to support a conclusion that the sending of at least one of these three letters was within the scope of the authority possessed by Sims or McDonald to act for Hendrey.

[2] We therefore come back to the inquiry whether the evidence sufficiently tended to show that Hendrey was a party to such a scheme, so that he was not entitled to an instructed verdict. In this respect we find the strongest evidence against him in connection with a statement which he furnished to a mercantile agency. The statement was vitally untrue. If he, when he gave it out, knew it to be essentially false and misleading, it would be difficult to avoid concluding that he was a party to the scheme involved; if he gave out only what he had been told by Sims and McDonald, and believed it to be true, and had no fraudulent intention, this act would not be sufficient to convict him. The issue of his good faith or fraudulent intent must go to the jury, and, again, it was not error to refuse to direct a verdict in his favor.

It is clear that the question of intent as to both these respondents was, or might be, a controlling question, and that to this issue they were entitled to have the proofs directed. Of course, it was important that the distinction between an intent to defraud, on the one hand, and, on the other, e. g., the discount of paper and its exchange for certificates of deposit in a way that was not dishonest, but merely imprudent, should be constantly and carefully preserved. We are bound to think that this distinction was not sufficiently regarded. This is shown by what occurred during the examination of respondent Sims. It had been arranged with McDonald that he should turn in, as his contribution, his stock in a bank in Kansas City, Kan., and Sims was asked whether, from what he had learned about it, he understood and believed this to be a solvent and successful bank. An objection to this question was sustained; the court holding, in substance, that the inquiry should be directed as to the facts which Sims learned regarding the

Kansas City bank, upon which facts he might have based a belief. In making clear his position, defendants' counsel said:

"Your honor is entirely correct, if the inquiry was as to the value of the stock; but the rule is otherwise, if the inquiry is whether this gentleman and others were or were not criminal and guilty of a fraudulent purpose. He may have formed an opinion without the slightest investigation, and may have carelessly formed it, and yet be guilty of no wrong. A man may come * * * into my office, and I trade with him or associate with him—I might be careless in my relations with him, because I ought to have investigated him before I ran with him, but I would not be criminal."

To this the court replied:

"There is such a thing as criminal carelessness. * * * I shall adhere to the ruling."

A similar ruling was made as to questions concerning the stock of each bank which was turned into the trust company. Sims was then further asked:

"Without regard to your knowledge of the value of the stocks of the various banks, with the presidents of which you were proposing to organize the American Trust Company, did you believe that those institutions, in the aggregate, were successful and prosperous and solvent institutions?
"The District Attorney: The same objection.
"The Court: The same ruling, and for the same reason."

Respondent Sims is not complaining of this action, and we cannot say that his good faith in the matter here inquired about was very important to the good faith of McDonald and Hendrey as to what we have found to be the scheme really involved on the trial. We do not see how they can directly complain of this ruling, but it is important in another way.

[3] Both as to Hendrey and as to McDonald, the proofs showed their connection with a number of transactions which might be interpreted either as merely careless, improvident, or reckless banking, or as steps in a scheme to misappropriate the assets of the bank and defraud it or its creditors. As to some of the incidents, the tendency toward this latter aspect was remote; and as to others, it was more direct. These matters were, therefore, admissible in evidence as bearing on the general issue whether respondents were engaged in a good faith or in a fraudulent enterprise; as to each such matter, it is clear that the actual belief and actual intent of the respondents constituted the criterion by which, for the purposes of this case, the transaction must be judged. Whether a man of ordinary intelligence will naturally believe that a particular transaction is honest and innocent is important as evidence bearing on whether he did so believe; but, in this class of prosecutions, his actual belief is the ultimate fact which makes him innocent or guilty.

[4, 5] It follows that the respondents were entitled to instructions that respondents' guilt must be judged by their actual intent to defraud, rather than by their carelessness or recklessness in banking, or violation of banking laws, and that, upon this issue of intention, where it was to be determined by circumstantial evidence, respondents were entitled to be acquitted if all the evidence was as fairly consistent with innocence as with guilt. Respondents' requests 4, 6, and 8 were di-

rected to these subjects.  Each one of them is defective, in that it goes a step too far in what was asked.  This technically justifies its refusal; but each challenged the attention of the court to the subject, and respondents' right to a clear instruction thereon was so important that we could go far in overlooking defects in the requests.  In addition to that, these requests were drawn with reference to the theory that respondents were on trial only for the existence of a scheme antedating the corporate organization, and the court at that time was apparently accepting this theory and giving some requests accordingly.  Under those conditions, we think it was error not to give the substance of these requests; and the question must be whether the error was cured in the general charge, during the course of which it was said:

"Are the acts and statements of the officers, directors, or owners of the American Trust Company, as shown by the evidence, consistent with the conclusion that it was the intention of the defendants to organize and operate in good faith and for an honest purpose a trust and banking company in Memphis?  If so, then your verdict should be not guilty."

This language may be read so as to cover and include the proposition that the belief of the respondents, however unfounded or unreasonable, might be a sufficient defense; but it does not present distinctly and sharply to the jury this ground of defense.  In determining the effect upon the jury of these charges and refusals, regard must be had to what has before been quoted as occurring during Sims' examination.  It was there distinctly announced that respondents' belief was not important, unless it was well founded, and, in effect, that their carelessness might be sufficient to make them guilty of the crime charged.  We cannot think that the above-quoted portion of the general charge would remove this impression, and it follows that the refusal to give the substance of the special charges must be deemed prejudicial, unless there is some further reason to the contrary.

[6, 7] As to Hendrey, we observe no such further reason.  As to McDonald, we cannot be content to set aside the judgment and direct a new trial because of error in this matter.  He was a witness for himself, and it appears without dispute that he wrote letters soliciting stock purchases or deposits, each of them containing the false statement that $100,000 or $110,000 of the capital stock had been paid in; and that he prepared and sent the semiannual statement of June 30th, required by law, and which was false in almost every particular.  The justification which he attempts to make of these statements is not plausible enough to be taken seriously.  He was certainly planning and co-operating with Sims, after the first plans had fallen through, to make further stock sales, and to get business and deposits, and to do it by means of these statements.  Under such a condition of the record, a finding that he did not intend to deceive would be arbitrary, and we cannot think that giving, in the fullest form, the instruction that his actual belief was the criterion, could have made any difference in the result.  The same reasons will not apply to Hendrey.  No false statement made by him, intending to give this company false credit, was indicated by the record, except the one to the mercantile agency;  and, whatever the jury might think, we cannot say that his claim to have

been then repeating what his associates told him and what he believed to be true was a mere subterfuge.

We do not see that this affirmance, as to McDonald, is inconsistent with our treatment of the superficially similar situation disclosed in the Sparks Case, in which Sparks was awarded a new trial. The Sparks Case, upon its facts, is typical of those in which the guilty intent must be determined by careful and intelligent consideration of the evidence tending both to affirm, and to deny such intent, and the case against Sparks is, therefore, to be classified, with the case against Hendrey upon the present record, while the case of McDonald is typical of those in which the intent to deceive cannot be seriously doubted, and in which we are therefore justified in concluding that a failure to give complete instructions on the subject of intent was not prejudicial.

[8, 9] Some other matters require mention. Respondent Toenges (one of those against whom the case was discontinued) had been in the employ of respondent Bonds' bank in Kansas City, and then was employed by Hendrey in his Memphis bank, and later acted as cashier of the American Trust Company. Apparently he was claimed to be a sort of connecting link between Hendrey and the American Trust Company. Testimony was admitted regarding a supposed embezzlement by Toenges while he was employed in the Kansas City bank. Not only was this foreign to any of the issues in the present case, and distinctly prejudicial, but the testimony on the subject came from a government witness, who knew only what Bonds had told him, and what he had seen in entries made by some one on the books of the Kansas City bank. The statement by Bonds was made after the scheme to defraud involved in this indictment was at an end, and, even if the rule of evidence in conspiracy cases is to be applied, such a statement was hearsay.

[10] Evidence was received as to the contents of the books of the Memphis bank of which Hendrey was president. This bank was a corporation, and the contents of the books of the corporation could not be put in evidence in a criminal prosecution against the president, without a more direct showing of his personal responsibility for the bookkeeping than we observe here. Worden v. United States (C. C. A. 6) 204 Fed. 1, 9, 122 C. C. A. 315.

For the guidance of the court and counsel upon another trial of Hendrey, we state our conclusions upon other errors alleged, but think there is no sufficient object in elaborating them. We find no error in the matters presented by respondents' counsel in their brief under the headings II, III, and IV. Some of the items of evidence, grouped under V as erroneously admitted, seem to us rather remote, if relevant at all; but we see nothing so far beyond the limits of the discretionary judgment which the trial court must exercise on that subject, and so substantially harmful, that we can call it prejudicial error.

The general legal principles applicable to the questions in this case have been so fully and so recently discussed by us in Bettman v. United States, 224 Fed. 819, 140 C. C. A. 265, Tucker v. United States, 224 Fed. 833, 140 C. C. A. 279, Hendrey v. United States, 233 Fed. 5, 147 C. C. A. 75, and Sparks v. United States, supra, that it seems unneces-

sary to repeat here what has been there said. We have only undertaken to apply these principles to the facts of this case.

The verdict and sentence against Hendrey are reversed, and the case, as to him, remanded for a new trial; the sentence upon McDonald is affirmed.