### REDMOND v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. September 22, 1925.)

No. 1819.

1. **Post office** ⟪⟫35—**That scheme to defraud was promoted in corporate name is not available to controlling member of corporation as defense.**

One who, in furtherance of scheme to defraud, organizes a corporation, of which he is the active and controlling member and in whose name scheme is promoted, cannot shield himself from consequences by claiming that he is not individually liable for corporation's acts.

2. **Post office** ⟪⟫35—**Whether defendants were in position to make pretended purchases of securities held immaterial, if they did not intend to do so.**

Whether defendants, charged with use of mails in furtherance of scheme to defraud by pretended purchases of securities, to be paid for by customers in small installments, were in a position to make such purchases, *held* immaterial, if they did not intend to make them, but rather to appropriate payments made to their own use and benefit.

3. **Post office** ⟪⟫48(4)—**Scheme to defraud need not be described with more particularity than is necessary to apprise defendant of its nature.**

Under Cr. Code, § 215 (Comp. St. § 10385), while scheme or artifice to defraud must be set

out in all its substantial elements, it is not necessary that it be described with any further particularity than is necessary to apprise defendant of scheme with which he is charged.

**4. Criminal law ☞447—Testimony by defendant's employee as to records kept in furtherance of scheme to defraud held properly admitted.**

In prosecution for use of mails in furtherance of scheme to defraud, by pretended purchases of securities for customers, who were to pay for them by small installments, it was not error to admit testimony of employee of defendant as to so-called "blotter sheets" kept by defendant, having blank spaces thereon to be filled in later by entry of purchases of stock from fictitious persons, so that it would appear securities had been ordered when purchase made by customer.

**5. Criminal law ☞1186(4)—Post office ☞49 —Evidence held erroneously admitted in prosecution for use of mails to defraud, but not ground for reversal.**

In prosecution for use of mails to defraud by pretended purchases of securities for customers, who were to pay for them in installments, it was error to permit witness to testify that confirmations of purchases of stock shown him, which he admittedly had not seen before, were from a particular broker, in absence of evidence of source or genuineness of such confirmations, though not grounds for reversal, in view of Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246).

**6. Criminal law ☞434—Book containing résumé of company's business for year held properly admitted in prosecution for use of mails to defraud.**

In prosecution for use of mails to defraud, by pretended purchases of securities for customers, who were to pay for them in installments, book containing résumé of company's business for year, and signed by witness under whose supervision it had been made, held properly admitted in evidence.

**7. Criminal law ☞434—Account book, showing transactions with broker, held properly admitted in prosecution for use of mails to defraud.**

In prosecution for use of mails to defraud, by pretended purchases of securities for customers, who were to pay for them in installments, account book showing transactions with particular broker held properly admitted in evidence, though witness identifying it admitted he had never seen it before, though he evidently knew that such a book was kept.

**8. Post office ☞49—Confirmation of purchases of securities received by United States Marshal in possession of defendant's office held properly admitted in prosecution for use of mails to defraud.**

In prosecution for use of mails to defraud, by pretended purchases of securities for customers, who were to pay for them in installments, confirmations of sales to corporation, controlled by defendant, received through mails by United States Marshal, who had taken possession of office under warrant issued by bankruptcy court, held properly admitted in evidence.

Bingham, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

George F. Redmond was convicted of use of mails in furtherance of scheme to defraud and of conspiracy to so use mails, and he brings error. Affirmed.

Leo A. Rogers, of Boston, Mass. (Daniel A. Shea, of Boston, Mass., on the brief), for plaintiff in error.

George R. Farnum, of Boston, Mass. (Harold P. Williams, of Boston, Mass., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. The plaintiff in error, hereinafter called the defendant, was convicted in the court below upon two indictments, in one of which he was charged, with several others, under section 215 of the Criminal Code (Comp. St. § 10385), with the use of the United States mails in furtherance of a scheme to defraud, and in the other with conspiring, under section 37 of the Criminal Code (Comp. St. § 10201), to commit the offense of using the United States mails for the purpose of carrying out the same.

In 1915 the defendant caused a corporation, known as G. F. Redmond & Co., to be organized under the laws of the commonwealth of Massachusetts, to do a stock brokerage business, whose capital stock was $100,000, divided into 1,000 shares, of which the defendant held 998, Diggins, his brother-in-law, 1, and Lamont 1, which he testified the defendant had transferred to him. The defendant was the treasurer of this corporation, Diggins clerk, and Lamont its president. Its head office was in Boston, and it had in 1923 13 branch offices, about 11,000 customers and 400 to 500 employees. It had as subsidiaries Withington & Co. and T. F. Manning & Co. It claimed to do business by buying stocks for its customers upon the partial payment plan which, in a booklet issued by it, was stated to be as follows:

"When you make the initial payment of 20 per cent., we buy the stock or bond for your account at the market price. This leaves 80 per cent. of the purchase price due us from you, which we carry for you, charging you interest at the rate of 6 per cent. per annum on your debit balance. In effect,

we extend you credit on the difference between the purchase price of the securities we buy for your account and the amount you pay us. The monthly statement also shows all credits from all sources, including dividends accruing to the securities carried in the customer's account, when there are such credits. Naturally the interest, as well as your monthly payment, becomes less each month. The securities you purchase are our collateral for the credit extended to you."

An involuntary petition in bankruptcy was filed against the corporation on March 4, 1924, and receivers were appointed. Previous to this there had been an inspection of the affairs of the company by post office inspectors, who had interviews with Redmond and with Lamont. From the report of the inspectors its appeared that, at the time the company was closed down and its business stopped, it had in its possession securities of the value of about $120,000 and owned others of the value of about $60,000, which it had pledged as collateral, that to purchase all the stock which it had agreed to purchase for its customers would require about $8,000,000, and that it owed its customers about $2,800,000. The evidence disclosed that nobody connected with the company was a member of any stock exchange, that brokerage houses and persons with whom the company claimed to have had business, and from whom its books showed that it received confirmation sheets, were fictitious, and that the amount of stock which it had purchased under its proposed plan could not be ascertained, because certain books of the company had been destroyed by direction of the defendant. These books were the customers' stock ledger and in and out books, showing the purchase of stocks and their transfer.

There was evidence from which the jury could find that the confirmations which the company had entered upon its books were fictitious and fraudulent. One Voliner, a receiving clerk in the employ of the company, testified that he received stock from only one New York broker, about one item a week, and that no stock was ever received from other New York brokers from whom confirmations were alleged to have been received.

The president of the company, Lamont, testified that:

"Our concern had dealings with a New York broker by the name of McCarty; but I do not know him or know whether or not he is a real person. We had dealings with a New York broker by the name of Murray; but I do not know or did not know whether or not he is a real person."

As a result of complaints, Post Office Inspector Hall had an interview with Lamont on February 14th, who requested that he wait for the return of Redmond, which was done, and on February 19th he interviewed the latter. At this interview it was computed that, in order to carry out the partial payment plan with 11,000 customers, it would be necessary to expend about $8,000,000. The inspector asked to be allowed to take an inventory of stock on hand, which Redmond refused to have done, on the ground that the certificates were pledged with brokers in many places, and that it would involve a very severe interruption of business to produce them. The post office inspector summed up his efforts to learn about the financial condition of the company in these words:

"So I was never able to ascertain from my visits or from my examination precisely what stock sales or purchases had been made by G. F. Redmond & Co."

There was evidence from which the jury could find that stocks were not actually purchased and carried for a customer upon his credit, as promised in the booklet issued by the company; that entries were made of purchases in fictitious names of stock whenever a customer entitled to delivery called for delivery of his stock which he had previously purchased, according to a confirmation received by him; that the list of fictitious names was in the possession of one of the employees of the company, which he was enjoined to keep secret and never show to anybody; and that for his services he was to receive the sum of $50,000 at the end of 2 years. He received his instructions directly from the defendant, who instructed him to go to Mr. Bowman, who would show him the work which he was to do.

The scheme to defraud was set out in the indictment as follows:

"That said defendants should, under the name and style of G. F. Redmond & Co., Inc., and Withington & Co., falsely pretend and represent that they (the said defendants) were in a position to purchase, and would purchase for and on the account of such persons, so intended to be defrauded, stocks and securities on a partial payment plan, so called, which said partial payment plan was, in substance and effect, as follows: That is to say, that said defendants would purchase stocks and securities for and on the account of such persons so intended to be defrauded, upon the payment of a small initial payment of the purchase price and the payment of the balance due on said purchase price in easy monthly payments; that

said defendants would in effect extend to the persons so intended to be defrauded credit on the difference between the purchase price of said stocks and securities to be bought for and on account of such persons so intended to be defrauded and the small initial payment made by such persons so intended to be defrauded.

"Whereas in truth and in fact as they (the said defendants) at all of said times well knew, they, the said defendants, were not in a position to purchase said stocks and securities upon the payment of a small initial payment by the persons purchasing said stocks and securities, but, on the contrary, they (the said defendants) at all of said times had the view and intent to take into their possession and under their control the moneys and property of all and each of such persons as should invest money and property with them (the said defendants) as aforesaid, and convert such money and property to their (said defendants') own use and benefit and each of such persons to cheat and defraud."

There were nine counts in each indictment, in which it was alleged that a letter in furtherance of said scheme to defraud, addressed to a certain person named in each count, was sent through the mails of the United States. The defendant was convicted upon all the counts except the first and sixth in each indictment.

The errors assigned are: The denial of a motion to direct a verdict for the defendant; the failure to give instructions requested; instructions that were given; and the admission of evidence.

It was claimed by the defendant, in his motion for a directed verdict, that there was no evidence that the defendant personally or in concert with others had devised a scheme to defraud, and he requested, in substance, that the jury be so instructed.

[1] The jury were instructed, in substance, that, if they should find that Redmond & Co. did not purchase shares of stock upon payment of one-fifth of the purchase price, as promised in the booklet which was issued by the company, or if it was not in a position to purchase them, under the allegation in the indictment that the defendant, under the name and style of G. F. Redmond & Co., Inc., and Withington & Co. made these representations, the scheme to defraud was one devised by the defendant and his associates, and that the indictment alleged a scheme to be carried out by the defendants under the name and style of G. F. Redmond & Co.

Stripped of all legal verbiage, the question presented is whether one who has organized a corporation of which he is the active and controlling factor, and who is the sole owner of practically all its capital stock, may shield himself from the consequences of his acts as the chief actor in the affairs of the corporation, by claiming that he is not individually liable for any of its acts.

While the indictment, in setting out the scheme to defraud, alleges that the defendants, under the name and style of G. F. Redmond & Co., Inc., and Withington & Co., did "falsely pretend and represent that they (the said defendants) were in a position to purchase and would purchase, for and on the account of such persons so intended to be defrauded, stocks and securities on the partial payment plan," and does not allege that the acts to be done in furtherance of the scheme or artifice to defraud were to be done under the name and style of G. F. Redmond & Co., Inc., and Withington & Co., it is perfectly apparent that this is what was charged and that the allegation that the defendants "were not in a position to purchase said stocks and securities upon the payment of a small initial payment * * * but on the contrary they (the said defendants) at all of said times, had the view and intent to take into their possession and under their control the moneys and property of all and each of such persons as should invest money and property with them, the said defendants, as aforesaid, and convert such money and property to their (said defendants') own use and benefit and each of such persons to cheat and defraud," by necessary implication charges that the said defendants, under the name and style previously stated, were unable to make these purchases and had the intent alleged.

[2] Whether the defendants were in a position to purchase stocks and securities upon the payment of a small initial payment is immaterial, if they did not intend to purchase the same, but had the intent by their scheme or artifice to obtain the money and property of other persons and convert the same to their own use and benefit.

In United States v. Comyns, 248 U. S. 349, at page 353, 39 S. Ct. 98, 100 (63 L. Ed. 287), the Supreme Court said:

"To use the mails in order to carry out a scheme for getting money by the making of promises or agreements which, whether known to be impossible of performance or not, there is no intention to perform, is a forbidden use of the facilities of the post office department"—citing Durland v. United

States, 161 U. S. 306, 313, 16 S. Ct. 508, 40 L. Ed. 709.

See, also, Byron v. United States (C. C. A.) 273 F. 769; Badders v. United States, 240 U. S. 391, 394, 36 S. Ct. 367, 60 L. Ed. 706; Pandolfo v. United States (C. C. A.) 286 F. 8.

[3] While the scheme or artifice to defraud must be set out in all of its substantial elements, it is not necessary that it be described with any further particularity than is necessary to apprise the defendant of the scheme to defraud with which he is charged. The gist of the offense is the use of the mails of the United States with intent to defraud. Brooks v. United States, 146 F. 223, 76 C. C. A. 581; Lemon v. United States, 164 F. 953, 90 C. C. A. 617; Horn v. United States, 182 F. 721, 727, 105 C. C. A. 163.

In the last case, the court said:

"While the formation of some scheme or artifice to defraud is an essential element of the offense, the gist of the offense is the use or attempted use of the United States mails for the forbidden purpose. It is only necessary, therefore, to charge the scheme with such particularity as will enable the accused to know what is intended, and to apprise him of what he will be required to meet upon the trial; and if it is distinctly alleged that the United States mails are to be used, or are intended to be used, in consummating such scheme, that is sufficient."

In Moffatt v. United States, 232 F. 522, 146 C. C. A. 480, the law in relation to the allegation of the scheme to defraud is stated as follows:

"In an indictment for mailing a letter in execution or attempted execution of a scheme to defraud, in violation of this statute, if the scheme is sufficiently outlined to show its design and adaptability to deceive and to fairly acquaint the accused with what he is required to meet, it answers the requirements of the statute. Brooks v. United States, 146 F. 223, 76 C. C. A. 581. The test to be applied is, not whether the material averments of this indictment might have been made more accurate and certain, but whether they plainly embrace in their terms both requirements, of notice of the ultimate facts to be proved against the accused, and specification thereof which will leave no second prosecution open for the alleged offense. If these requisites are sufficiently stated it is the duty of the court to uphold the indictment"—citing Cochran v. United States, 157 U. S. 286, 15 S. Ct. 628, 39 L. Ed. 704; Rosen v. United States, 161 U. S. 29, 16 S. Ct. 434, 480, 40 L. Ed. 606;

Markham v. United States, 160 U. S. 319, 16 S. Ct. 288, 40 L. Ed. 441.

"Section 215 of the Penal Code only requires two things to complete the offense charged in this indictment, (1) that a scheme to defraud be devised; and (2) that, for the purpose of executing it, the defendant caused to be delivered by mail, by the post office establishment of the United States, the letter set forth in count 3 of the indictment, to the person therein named."

See, also, McDonald v. United States, 241 F. 793, 797, 154 C. C. A. 495; Kaufmann v. United States (C. C. A.) 282 F. 776, 783; Olsen v. United States, (C. C. A.) 287 F. 85, 89; Brewer v. United States (C. C. A.) 290 F. 807; Stewart v. United States (C. C. A.) 300 F. 769, 775.

There was no error in the refusal to give the instructions requested, or in those that were given, or in the denial of a motion for a directed verdict.

[4] A witness, MacLean, who testified that he was employed by the defendant and directed by him to report to a Mr. Bowman, who had charge of blotter sheets, and was promised by the defendant a large sum if he would keep secret all the transactions which passed under his observation, was permitted to testify, over the objections of the defendant, in regard to talks that he had, not only with Bowman, but with the managers of G. F. Redmond & Co., in regard to entries upon blotter sheets not made by him. The record discloses that MacLean's testimony related to the general method of making up blotter sheets used by G. F. Redmond & Co. While from the blotter sheets shown him he could select only three upon which entries were made made by him, his testimony was admissible to show the system that was in use in regard to the same, and that blank spaces were left upon them to be filled in later by the entry of purchases of stock from fictitious persons, so that it would appear that the stock ordered by a customer had been actually purchased as soon as the order was received. MacLean and those who worked with him made these fictitious entries. He testified that he had received instructions from the head blotter clerk, to whom the defendant had told him to report, and also from the managers of the company, particularly from one by the name of Baker, and that he had been enjoined by the defendant to keep secret what was done with these blotters, and promised the large bonus of $50,000 at the end of two years for doing so.

His testimony was admissible to show the system pursued with reference to the blotters, which showed purchases of stock, and that the representation made in the booklet issued by the company, that stock would be purchased for a customer upon receipt of his order, on the partial payment plan, and held for him until he had completed his payment for the same and interest at 6 per cent., was false, and was a part of the alleged scheme to defraud.

For the same reason the testimony of the same witness in regard to his conversation with the manager, Baker, was admissible. This disclosed that the list of fictitious names to be used in making false entries upon the blotters was changed "every three or four months," and was "to be kept private, and nobody was to know anything about them but myself and the Bowmans."

Lamont testified that Redmond, the defendant, "was active in the business and gave the orders," as would be expected in the case of one who owned practically all its stock; and it is idle to contend that he did not know what methods were being pursued or that he had not directed them.

There was no error in admitting the testimony of MacLean in regard to the method pursued by him, evidently under the direction of his superiors.

Lamont, the president of G. F. Redmond & Co., was shown what purported to be confirmations of sales made to it by brokers, and, while he said that he had never seen the confirmations before, he recognized them as confirmations of sales to G. F. Redmond & Co. by certain brokers. The admission of these confirmations is assigned as error.

[5] Lamont, who had previously testified that Redmond & Co. "operated with the broker who gave these confirmations, both at New York and Boston," when these confirmations were shown to him, testified that they were confirmations from this broker and one other. No evidence was offered to show the source from which these confirmations were obtained, and without this or some evidence to show their genuineness, or from which it could have been presumed, they should not have been admitted.

[6] Error is assigned because a book made under the supervision of the witness, Lamont, was admitted in evidence. This book contained a résumé of the business of Redmond & Co. for the year 1922, one copy of which, signed by the witness, was given to the defendant. It showed the number of accounts in all the offices of Redmond & Co. in 1922; the extent of the business for that year, which reached nearly $74,000,000, salaries paid, and other expenditures. It showed no brokerage commissions, except those paid to Boston Curb brokers, and did not show stocks on hand or receipts. It was a convenient summary of the business of the company for that year, and was made up from records which the witness had requested his bookkeeping force to keep and under his supervision. This was clearly admissible.

[7] The Cassidy account book, which was admitted in evidence over the defendant's objection, which is assigned as error, was a book showing transactions with a broker by that name. Lamont testified that this was one of the books kept by Redmond & Co., and he recognized it as such, although he had never seen it before. He evidently knew that such a book was kept, and there was no error in its admission.

[8] Certain confirmations of sales and securities by H. M. Williams of New York City, addressed to G. F. Redmond & Co., Boston, Mass., were received through the mail at the office of Redmond & Co. in Boston after the United States Marshal had taken possession of the office under a warrant issued to him by the bankruptcy court. These were turned over to the receivers, and were received in evidence over the objection of the defendant, which is assigned as error.

These confirmation sheets were identified by order slips found in the office of Redmond & Co. by an accountant. They were properly admitted in evidence to show the methods pursued by the defendant in the execution of his scheme to defraud; and, for the purpose of showing what the defendant admits, they had a tendency to show, in connection with other evidence, that they were fictitious transactions with persons whom the jury might find upon the testimony did not exist.

The other assignments of error which have been argued relate to testimony in regard to attempts to locate certain brokers with whom transactions appeared to have been had from the confirmations and other testimony. We have carefully examined the record, and find no reversible error in the admission of this testimony.

Our conclusion is that the only error that was committed was in the admission of the confirmation sheets from the broker Jarvis. This was but slightly cumulative on a point fully proved by clearly competent evidence, and, after a careful examination of the entire record, we think this was a technical error which did not affect the substantial rights of the defendant. Section 269, Judicial

Code, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246).

The judgment of the District Court is affirmed.

BINGHAM, Circuit Judge, dissents.